2002 UT 106

**STATE of Utah, Plaintiff and Appellee,**

v.

**Troy Michael KELL, Defendant and Appellant.**

No. 960377.

Supreme Court of Utah.

Nov. 1, 2002.

Rehearing Denied Nov. 8, 2002.

See also 40 P.3d 611.

Mark L. Shurtleff, Att'y Gen., Laura B. Dupaix, Kirk Torgensen, Scott Reed, Asst. Attys Gen., Salt Lake City, Ross Blackham, Manti, for plaintiff.

Stephen R. McCaughey, Salt Lake City, for defendant.

## AMENDED OPINION

DURHAM, Justice:

¶ 1 Defendant Troy Michael Kell, an inmate at the Central Utah Correctional Facility (CUCF) in Gunnison, Utah, was charged with aggravated murder, a violation of section 76–5–202 of the Utah Code. After being tried in a courtroom located inside the prison facility, he was convicted and sentenced to death.

### BACKGROUND

¶ 2 Defendant stabbed fellow inmate Lonnie Blackmon (Blackmon) to death on July 6, 1994. Prior to the attack, defendant, a white supremacist, had been involved in race-related altercations with several African–American inmates, including Blackmon.

¶ 3 On the day before the killing, defendant and two of his accomplices, Eric Daniels (Daniels) and Paul Payne (Payne), submitted medical request forms to visit the prison's medical facility. In addition, Daniels forged a medical request form in Blackmon's name so that Blackmon would be transported to the medical facility at the same time defendant and his accomplices were being transported.

¶ 4 Moments before the attack occurred, defendant and Blackmon were moved from the upper tier of the building at the CUCF where they were housed to the lower tier where they awaited transfer to the prison's medical facility. Both defendant and Blackmon were placed in double locked handcuffs fastened to a belt around the waist. Their feet were not placed in shackles so that they could safely descend the stairs from the top tier of the cell block. By this time, Daniels had also been moved to the lower tier to go to the medical facility. Payne's request to go to the medical facility had been denied because he was in punitive isolation on the top tier of the cell block. Nevertheless, at his insistence, Payne was permitted to shower on the lower tier of the cell block rather than in the showers located on the second tier of the cell block, where his cell was located.

¶ 5 While descending to the lower tier, defendant removed his handcuffs with a partial handcuff key that had been altered with

a homemade handle made from melted plastic utensils. Defendant also produced a shank.[1] Blackmon was standing with his back to defendant talking to other inmates, when defendant began to stab him repeatedly in the neck, eyes, face, back and chest. Defendant was free to use his unrestrained hands and arms during the attack, but Blackmon could only kick at his attackers to defend himself because he was still in handcuffs that were attached to his waist. Blackmon's efforts were futile in any event because Payne choked and punched him and Daniels held onto his legs during the attack.

¶ 6 For over two and a half minutes, defendant slashed Blackmon with his shank, inflicting sixty-seven stab wounds, only two of which were described by the forensic examiner as being capable of inflicting death in the short term. Despite Blackmon's pleas to stop, defendant continued the assault and, in fact, after walking away, returned twice to inflict more wounds, until Blackmon lay motionless on the floor of the cell block. Blackmon bled to death and defendant was charged with aggravated murder. A more detailed account of the attack can be found in the companion case of *State v. Daniels*, 2002 UT 2, 40 P.3d 611.

¶ 7 Following two pretrial evidentiary hearings, the trial court determined to hold defendant's trial in a regular courtroom located inside the CUCF. This decision was based on security risks particular to defendant, including his criminal background, prison disciplinary record, and overall prison history. In addition, several logistical problems regarding security existed in trying defendant in either of the two courtrooms available outside the prison. Because most of the numerous witnesses in the case were either prison guards or high security inmates, the security risks and costs associated with transporting all of them to a courtroom located outside of the county would have been extremely high; thus, the trial court decided to hold the trial in the courtroom located within the confines of the prison.

¶ 8 At trial, defendant testified that he killed Blackmon because Blackmon had overtly threatened him. According to defendant, Blackmon wanted to make an example of him to the other inmates to demonstrate Blackmon's power in the prison. Defendant stated he believed Blackmon was making a threat when he overheard Blackmon say to another inmate on the day of the killing, "Yeah man ... it's on. You know it," even though Blackmon made no threatening gestures toward defendant. Defendant claimed that due to conditions in the prison and circumstances surrounding Blackmon's threats, he was suffering from "extreme emotional disturbance" at the time of the homicide. One eyewitness testified, however, that during the attack defendant's demeanor was "very business like, as cold as cold gets. It was like he was doing a job."

¶ 9 Based on his testimony, defendant asked the court to instruct the jury on the defense of imperfect self-defense manslaughter, but the court declined his request. The trial court did, however, instruct the jury on the lesser included offense of murder, as well as aggravated murder. The jury unanimously found the defendant guilty of aggravated murder and sentenced him to death.

¶ 10 On appeal defendant raises twelve claims of error, as follows: (1) the trial court erred by denying him his constitutional rights to a public trial, to the presumption of innocence, to a fair trial, and to equal protection of the law, by trying him in a courtroom located inside a prison; (2) the trial court violated his constitutional right to a fair trial by denying him an impartial jury in its rulings on voir dire; (3) the trial court erred by failing to instruct the jury on the theory of imperfect self-defense manslaughter; (4) the trial court erred by requiring jurors to view a videotape of the homicide; (5) multiple evidentiary errors individually and cumulatively deprived him of a fair trial; (6) the prosecutors violated his rights to due process of law and protection under the Eighth and Fourteenth Amendments of the United States Constitution by making improper arguments to the jury; (7) the trial court erred during the penalty phase by forbidding the jury to consider mercy and sympathy as mitigating factors; (8) the victim impact evi-

---

1. A shank is a crude, homemade steel "knife" usually about three to four inches in length.

dence admitted in the penalty phase and the Utah statute that allows it, are unconstitutional; (9) Section 76–5–202 of the Utah Code, which describes the aggravating factors necessary for capital murder, is unconstitutionally vague on its face; (10) the Utah death penalty statutes are unconstitutional because they do not narrow the class of death-eligible murders, thus encouraging the arbitrary and capricious application of the death penalty; (11) the capital sentencing proceedings were flawed; and, (12) because defendant had already been disciplined through the prison's disciplinary proceedings, the subsequent trial violated state and federal constitutional double jeopardy provisions. Because defendant raises numerous issues involving different standards of review, we set forth the proper standard as we address each issue.

## ANALYSIS

### I. WHETHER THE LOCATION OF THE TRIAL PREJUDICED THE DEFENDANT

¶ 11 Defendant argues that holding the trial in a courtroom inside the prison denied him his constitutional rights to a fair trial, the presumption of innocence, equal protection under the law, and a public trial. We reviewed some of these issues in *State v. Daniels*, where we applied close judicial scrutiny and reviewed the trial court's decision for correctness. 2002 UT 2 at ¶¶ 15–19, 40 P.3d 611.

¶ 12 In *Daniels*, this court concluded that holding the trial at the prison did not constitute a violation of the defendant's constitutional rights to a fair trial or to the presumption of innocence, because "try[ing] an inmate in a prison courtroom for a violent crime alleged to have been committed inside a prison by a person incarcerated for a previous conviction does not per se present an unacceptable risk of bringing into play impermissible factors which might erode the presumption of innocence." 2002 UT 2 at ¶ 26, 40 P.3d 611. Nevertheless, we concluded that "a case-by-case evaluation is neces-

sary" to make the determination whether to hold a trial in a prison. *Id.*

¶ 13 Here, in addition to alleging the lack of a fair trial or presumption of innocence, defendant also raises a claim regarding his right to equal protection. The latter claim warrants identical treatment as the previous ones; we hold that no constitutional violations have occurred because the actions taken by the trial court were not inherently prejudicial. *See id.* at ¶ 20 (citing *Holbrook v. Flynn*, 475 U.S. 560, 567, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986)).

¶ 14 This ruling is supported by responses to the questionnaires filled out by each potential juror in this case. For example, the juror questionnaire asked, "Does the fact that this trial is being held at the Central Utah Correctional Facility affect your ability to sit as a juror in this case?" Of the one hundred and thirteen potential jurors who filled out questionnaires, only ten answered the question affirmatively, and of those ten, only two potential jurors explained that it was because they did not feel comfortable with the courtroom location itself. Neither of the jurors who expressed reservations about the prison were selected to sit on the jury. Accordingly, we conclude that the location of the trial did not prejudice the outcome of this case.

¶ 15 Finally, defendant argues that holding the trial in the prison violated his Sixth Amendment right to a public trial. In most cases, if the reviewing court finds that a constitutional error was harmless beyond a reasonable doubt, it need not reverse. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *State v. Villarreal*, 889 P.2d 419, 425 (Utah 1995). The U.S. Supreme Court has, however, identified a few unique circumstances in which a constitutional error so undermines the fairness of the proceedings that prejudice must be presumed. *E.g., Johnson v. United States*, 520 U.S. 461, 468–69, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (identifying six constitutional errors that make up the "very limited class of cases" that defy harmless-error analysis). A violation of the accused's right to a *public* trial is one such circumstance.[2] *See Waller*

---

**2.** The other constitutional errors for which preju- dice must be presumed are: a complete depriva-

v. Georgia, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984); see also State v. Crowley, 766 P.2d 1069, 1071 (Utah 1988)(quoting State v. Jordan, 57 UT 612, 618, 196 P. 565, 567–68 (1921)) (holding that prejudice is presumed when one's right to a public trial under the Utah Constitution has been violated).

¶ 16 In this case, there is no evidence that defendant's right to a public trial was violated. The requirement of a public trial serves an essential purpose: "that the public may see [the accused] is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." Waller, 467 U.S. at 46, 104 S.Ct. 2210 (quoting Gannett Co. v. DePasquale, 443 U.S. 368, 380, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979)). Here, although the trial took place in a courtroom at the prison, the proceedings were in no way closed to the public. Cf. State v. Jackson, 178 Or.App. 233, 243–44 & n. 3, 36 P.3d 500 (2001) (holding that a defendant's right to a public trial under the Oregon Constitution was violated where the trial, which was held in a prison, was closed to the public, where the proceedings were broadcast by close-circuit television to a public courtroom, and where the State had made no showing of need to restrict access to the proceedings). Indeed, when deciding on the venue for the trial, the trial court stated that at least twenty-three non-inmate citizens were expected to attend the proceedings. While the prison courtroom may or may not have been as inviting to the public as another venue, there is no evidence that the public could not freely attend. We therefore find that defendant's right to a public trial was not violated.

## II. WHETHER DEFENDANT WAS DENIED A FAIR TRIAL BECAUSE OF ERRORS IN THE JUROR VOIR DIRE PROCESS

¶ 17 Defendant claims he was denied the right to a fair trial because the jury voir dire process was flawed. Specifically, he contends that the court should have denied two improper for-cause challenges by the prosecution and granted five proper for-cause challenges by the defense. A trial court's decision to grant or deny a motion to remove a juror for cause is reviewed for an abuse of discretion. State v. Lafferty, 2001 UT 19, ¶ 58, 20 P.3d 342.

¶ 18 The federal constitutional standards relating to jury selection in death penalty cases were articulated by the United States Supreme Court in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). It held that a death sentence could not be carried out "if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Id. at 522, 88 S.Ct. 1770. The Court recognized that such wholesale exclusions of veniremen constituted a violation of the defendant's Sixth and Fourteenth Amendment rights to an impartial sentencing jury. Id. at 513, 518, 88 S.Ct. 1770. The Court further articulated that "[i]t is ... settled that a State may not entrust the determination of whether a man is innocent or guilty to a tribunal 'organized to convict.'" Id. at 521, 88 S.Ct. 1770 (citing Fay v. New York, 332 U.S. 261, 294, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947)). However, the Court made clear that it would not bar a state from excluding for cause veniremen whose "attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt." Id. at 522 n. 21, 88 S.Ct. 1770.

¶ 19 Twelve years later, in Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), the Court explained Witherspoon and its progeny as establishing "the general proposition that a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Adams,

tion of the right to counsel, lack of an impartial trial judge, unlawful exclusion of grand jurors of defendant's race, violation of the right to self-representation, and an erroneous reasonable-doubt instruction to the jury. See Johnson, 520 U.S. at 468–69, 117 S.Ct. 1544.

448 U.S. at 45, 100 S.Ct. 2521. In light of the legal standard articulated in *Adams,* the question then becomes whether the trial court correctly applied it in the cases of prospective jurors V.D. and R.F.[3]

¶ 20 The record of the voir dire examination clearly shows that V.D. had reservations about imposing the death penalty in all but two circumstances: when a child molester kills a child, and when a rapist kills his victim. Her views fall into the category of those things that could "substantially impair the performance of ... [her] duties as a juror in accordance with ... [her] instructions and ... [her] oath." *Adams,* 448 U.S. at 45, 100 S.Ct. 2521. R.F. claimed the ability to listen to the facts and apply the law, but she also made other statements indicating that she would have a very difficult time imposing the death penalty herself. This court has previously held that the trial court is to be granted broad discretion in determining whether a juror should be dismissed for cause. *See State v. Carter,* 888 P.2d 629, 649–50 (Utah 1995); *State v. Young,* 853 P.2d 327, 344 (Utah 1993); *State v. Archuleta,* 850 P.2d 1232, 1240 (Utah 1993). In fact, in this case the trial judge was even-handed in excluding other prospective jurors for cause, most notably two jurors who were excused because they appeared to be too eager to impose the death penalty. Because the trial court should be afforded substantial deference in determining juror for-cause dismissals and because its ruling was not unreasonable given the high likelihood that the views expressed by these ju-

rors would substantially impair performance of their duties, we affirm.

¶ 21 As to defendant's five for-cause challenges denied by the trial court, we look again to the broad discretion standards articulated in *Carter, Young,* and *Archuleta.* Nothing in the record indicates that the trial court abused its discretion in denying the challenges. Thus, we affirm its ruling.

III. WHETHER THE TRIAL COURT COMMITTED STRUCTURAL ERROR BY NOT INSTRUCTING THE JURY ON THE THEORY OF IMPERFECT SELF–DEFENSE MANSLAUGHTER

¶ 22 Defendant argues that the trial court erred in refusing his request that the jury be instructed on imperfect self-defense manslaughter,[4] and in giving jury instructions that controlled the order of the jurors' deliberations. The State counters that defendant was not entitled to an instruction on imperfect self-defense because there was no evidence to support that theory. Further, the State asserts that the jury instructions were ordered in such a way that the jury had to consider the lesser offense of manslaughter before determining whether to convict on aggravated murder.

¶ 23 We have held that a defendant is entitled to a requested lesser-included offense instruction when:

(1) the two offenses are related because some of their statutory elements overlap,

---

3. V.D. and R.F. were two of the potential one hundred and thirteen jurors questioned prior to trial. Defendant raises specific objections to their respective voir dires, asserting improper for-cause challenges by the prosecution and improper removal by the court from the jury pool.

4. The fact that the jury was instructed on both aggravated murder and murder does not cure the claimed defect in the instructions. We held in *State v. Daniels,* 2002 UT 2, 40 P.3d 611, that, where the jury was instructed on aggravated murder and murder, it was harmless error for the court to fail to instruct on manslaughter. *Id.* at ¶¶ 27–29. We reasoned that since the jury had the option of convicting defendant on the lesser offense of murder, the jury would not have chosen to convict on another lesser included defense, i.e., manslaughter. *Id.* That reasoning, however, does not apply here. Unlike in *Daniels,*

where defendant sought to have the jury instructed on reckless manslaughter, in this case the defendant sought to have the jury instructed on imperfect self-defense manslaughter. The difference between aggravated murder, murder, and reckless manslaughter is the degree of culpable intent of the actor. On the other hand, aggravated murder, murder, and imperfect self-defense manslaughter cannot be distinguished simply by intent. Thus, the jury's decision to convict on aggravated murder rather than murder does not signal that they necessarily would have rejected imperfect self-defense manslaughter. If properly instructed, and if there were evidence in support, the jury could have found all of the elements of aggravated murder, rejected the charge of murder, and yet still convicted Kell of manslaughter based on the theory of imperfect self-defense.

and the evidence at trial of the greater offense involves proof of some or all of those overlapping elements; and (2) the evidence provides a rational basis for a verdict acquitting the defendant of the offense charged and convicting the defendant of the lesser-included offense.

*State v. Evans,* 2001 UT 22, ¶ 18, 20 P.3d 888 (citing *State v. Baker,* 671 P.2d 152, 159 (Utah 1983)).

 ¶ 24 Under the 1995 penal code, imperfect self-defense manslaughter is defined as a homicide in which the actor

> causes the death of another under circumstances where the actor reasonably believes that the circumstances provide a legal justification or excuse for his conduct although the conduct is not legally justifiable or excusable under the existing circumstances.

Utah Code Ann. § 76-5-205 (1995). A majority of the court concludes that the evidence in this case is insufficient to provide a rational basis for the jury to acquit Kell of aggravated murder and convict him of imperfect self-defense manslaughter.[5] The primary evidence offered to suggest that Kell acted out of fear for his life and believing he was legally justified was Kell's own self-serving testimony. In addition, the defense offered evidence to suggest that Blackmon was known to be dangerous, that racial conflicts were brewing at the prison, that prison guards do not always protect inmates, and that weapons and handcuff keys could be obtained in the prison.

¶ 25 The great weight of the evidence, however, runs contrary to defendant's claim of imperfect self-defense. First, Kell's claim that he acted out of self-defense is eclipsed by the evidence suggesting that Kell's motive for killing Blackmon was simply racism. Substantial evidence suggested that Kell was a

white supremacist, that he had written letters expressing a desire to harm an African-American inmate, that Kell attacked Blackmon viciously and relentlessly, and that Kell shouted racial epithets during and after the attack. Second, even if Kell did act in part out of self-defense, there was substantial evidence that Kell could not have believed himself to be in imminent danger at the time of the attack. The evidence clearly showed that Blackmon was attacked from the rear, that Blackmon was unarmed and handcuffed during the attack, that Daniels assisted Kell during the attack, and that Kell stabbed Blackmon multiple times and did not relent when it was obvious Blackmon would not fight back. Finally, the circumstances of the murder overwhelmingly suggest that Kell could not have *reasonably* believed he was *legally* justified in killing Blackmon. Although Kell testified that he believed he was acting out of self-defense, no persuasive evidence was offered to suggest that Kell believed that killing Blackmon in prison would be reasonable under the circumstances. Given the sparsity of the evidence to support defendant's imperfect self-defense claim and the substantial evidence to the contrary, we hold that the trial court did not err in declining to instruct the jury on imperfect self-defense.

 ¶ 26 We next consider whether the trial court improperly ordered the jury instructions. We have held that "a 'trial court is not to mandate a specific order of deliberation to the jury concerning lesser included offenses; rather, such instruction should be given by way of suggestion and recommendation.'" *State v. Piansiaksone,* 954 P.2d 861, 869 (quoting *State v. Powell,* 872 P.2d 1027, 1031 (Utah 1994)). In *Piansiaksone,* we held that it was improper to instruct the jury not to consider a lesser included offense if they found the defendant guilty of the charged

**5.** Associate Chief Justice Durrant and Justices Russon and Wilkins concur in this view. The author and Justice Howe are of the view that any evidence, even the uncorroborated testimony of the defendant, entitles a defendant to an instruction on his theory of the case, and that the trial judge should not make credibility determinations in criminal jury trials. The author and Justice Howe therefore conclude that the trial court erred in failing to instruct the jury on imperfect

self-defense manslaughter, but that it was harmless error. The defendant's testimony that he killed Blackmon in self-defense was clearly against the weight of the evidence, and our confidence in the verdict is not affected. *See State v. Evans,* 2001 UT 22, ¶¶ 18-23, 20 P.3d 888 (failure to give lesser included offense instruction harmless where there was minimal corroborating evidence of defendant's claim and significant evidence to the contrary).

offense. *Id.* at 870. We stated that ordering the instructions in this way wrongly "denied [defendant] his right to have the jury consider his theory of the case." *Id.*

 ¶ 27 In this case, the jury was explicitly instructed to order its deliberations and not to consider lesser included offenses unless it found the defendant innocent of the greater offense. With regard to manslaughter, the instructions stated: "Do not deliberate or vote on the charge of manslaughter, a lesser included offense, unless the State has failed to prove either aggravated murder or murder." That language was improper. The State argues that, despite this ordering of deliberation, the instructions were nonetheless proper since the instructions, in defining aggravated murder, told the jury that it could not convict on the charged offense unless it found beyond a reasonable doubt all of the elements of aggravated murder and "[t]hat [defendant] was not under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse." The State asserts that, by defining aggravated murder as including the absence of emotional disturbance, this instruction ensured that the jury considered manslaughter before convicting of aggravated murder.

¶ 28 On balance, we are persuaded that this theory cured the improper ordering of deliberation with regard to emotional disturbance manslaughter in this case, and rendered the error in the instruction harmless. Furthermore, since we held there was no error in failing to instruct on imperfect self-defense manslaughter, the defendant was not entitled to have the jury consider that theory, and the ordering problem does not arise with respect to it.

## IV. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ALLOWING THE JURY TO VIEW A VIDEOTAPE OF THE HOMICIDE

 ¶ 29 Defendant claims the trial court violated his constitutional right to a fair trial by allowing the jury to view a videotape of the homicide. He claims the videotape was unduly prejudicial and should have been excluded under rule 403. A trial court's decision to admit evidence under rule 403 of the Utah Rules of Evidence is reviewed for an abuse of discretion. *State v. Boyd*, 2001 UT 30, ¶ 23, 25 P.3d 985.

 ¶ 30 Rule 403 of the Utah Rules of Evidence states that "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Although rule 403 contains a presumption of admissibility of evidence, evidence that has "an unusually strong propensity to unfairly prejudice, inflame, or mislead a jury" will be deemed inadmissible. *State v. Lafferty*, 749 P.2d 1239, 1256 (Utah 1988). Inadmissible evidence may include gruesome photographs of a homicide victim's corpse, evidence of a rape victim's past sexual activities with someone other than the accused, and statistical evidence of matters not susceptible to quantitative analysis, such as witness veracity. *Id.*

 ¶ 31 However, even if the evidence has the potential for prejudicing a defendant, it will be admitted if it has unusual probative value. *State v. Vargas*, 2001 UT 5, ¶ 51, 20 P.3d 271; *see also State v. Decorso*, 1999 UT 57, ¶ 53, 993 P.3d 837 (holding that under rule 403, a court may "exclude relevant evidence only if its probative value is substantially outweighed by risk of unfair prejudice" (citing Utah R. Evid. 403)); *State v. Danker*, 599 P.2d 518, 519 (Utah 1979) (holding that "if evidence is relevant and competent, the mere fact that it may be inflammatory does not render it inadmissible"). We can think of nothing more probative and relevant than an actual videotape of a crime in progress. Although the videotape in question is disturbing and difficult to watch, it unequivocally illustrates defendant's demeanor, sheds light on his motivations for the attack, and objectively substantiates the testimony of the eyewitnesses. Because of their high probative value, we do not place videotapes of a crime in progress in the same category of evidence as gruesome photos tak-

en after the commission of a crime. Accordingly, we conclude that the high probative value of the videotape far outweighs any potential prejudice toward the defendant. Because the videotape is admissible under rule 403, the trial court did not err in allowing the jury to view it.

## V. WHETHER THE ALLEGED EVIDENTIARY ERRORS INDIVIDUALLY AND CUMULATIVELY DEPRIVED DEFENDANT OF A FAIR TRIAL IN BOTH THE GUILT AND PENALTY PHASES

¶ 32 Defendant asserts that various evidentiary errors committed during the guilt and penalty phases of the trial deprived him of a fair trial. Trial courts have wide discretion in determining relevance, probative value, and prejudice. *State v. Boyd,* 2001 UT 30, ¶ 23, 25 P.3d 985. We review admissibility determinations made by the trial court for abuse of discretion. *Id.; Lafferty,* 2001 UT 19, ¶ 105, 20 P.3d 342. However, where the complaining party failed to make a timely objection, we review the trial court's rulings for plain error. *State v. Dunn,* 850 P.2d 1201, 1208–09 (Utah 1993). We address each of the alleged errors in turn.

¶ 33 Six of defendant's claims of error were objected to at trial. We review the court's rulings on these for abuse of discretion.

¶ 34 First, defendant argues that the "Dear Luther" a letter, which was written by defendant to a fellow inmate located in Nevada,[6] should not have been admitted into evidence because it reflected badly on his character, but had "no bearing on the circumstances of Blackmon's death." We disagree. The letter is clear and convincing evidence of defendant's racist motivation and of his plan to kill Blackmon. While the

letter may have prejudicial effects, it does not fall within the category of evidence that is inherently prejudicial, and it has high probative value. Thus, the court's actions were in accord with rule 403's presumption of admissibility.

¶ 35 Second, defendant claims that admitting into evidence his post-homicide statements[7] to a prison guard violated his *Miranda* rights. Again, we disagree. The statements in question were volunteered by defendant and therefore are admissible without *Miranda* warnings. *Rhode Island v. Innis,* 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Further, while they may have been prejudicial, they were not inherently prejudicial; they were also highly probative as to his racist beliefs, a fact that went to the motive for the killing and demonstrated his clear premeditated intent. Thus, they were permissible under rule 403.

¶ 36 Next, defendant maintains that the "speculative" evidence concerning Daniels' forgery of Blackmon's medical request form should not have been admitted "for there was no showing that [defendant] was an accomplice to, or even aware of the forgery." However, the body of evidence presented by the State clearly showed that Daniels aided defendant in the attack, thus permitting an inference that the forgery was part of a plan. This evidence showed the attack was premeditated and rebutted defendant's claim that he faced a situation of "kill or be killed."

¶ 37 Defendant asserts that the medical examiner's report should not have been admitted into evidence because it was hearsay and not subject to confrontation. Defendant's argument is unfounded. The medical examiner relied on the report in her testimony at trial. Defendant had ample

---

6. Some of the relevant parts of the letter stated the following:

[¶ 3] It'll be interesting to see how things go in about 20 days. Be all alone with 4 niggers. I hate it when that happens Ha-ha.

[¶ 4] Lately it's been plot, strategy of inflicting pain on a niggers. I'm getting too old for this ship though.

[¶ 5] Things on this end will be getting live soon. Looks like I'll have to show me a nappy headed monkey what some of this white power is all about. They seem to never learn. . . .

7. While sitting in the x-ray exam room following the homicide, defendant looked at a prison guard and said, "He really liked you, you know." The guard did not respond and defendant said, "I can't stand all of the—" and gestured with his hand, and the guard said, "I don't know what that means." Defendant then said, "I hate monkeys with big mouths. I hate it when they talk about our women. They're taking over our race. I've got to do all I can to save our race. If everyone would take one out once in a while it would help a lot."

opportunity to cross-examine her regarding the report itself. Further, even if admitting the report was error, it was harmless. There was nothing in the report that added to or detracted from the medical examiner's testimony.

 ¶ 38 Defendant next argues that inmate Francisco Colon's rebuttal testimony [8] was improper because it was cumulative and unduly prejudicial. This testimony had significant probative value to rebut defendant's claim that the attack was not racially motivated. Thus, it was highly relevant and not unduly prejudicial.

 ¶ 39 Defendant also claims the court should not have admitted a small close-up autopsy photograph of the defendant's previous homicide victim [9] during the penalty phase of the trial because it was gruesome and presumptively inadmissible according to rule 403. While disturbing, the photograph is not gruesome in the sense of rule 403. It contains no blood stains or gaping wounds, elements that have been held to constitute a gruesome photograph. *State v. Decorso*, 1999 UT 57, ¶ 50, 993 P.2d 837. Further, the photograph was highly relevant to framing defendant's character before the jury in the penalty proceedings.

 ¶ 40 Although defendant has argued this point under rule 403, that rule does not govern the standard for considering the admissibility of the photograph. The admissibility standard for capital penalty phase deliberations is addressed in section 76–3–207(2)(b) of the Utah Code. That provision states that "[a]ny evidence the court considers to have probative force may be received regardless of its admissibility under the ex-

clusionary rules of evidence." Thus, "evidence may be admissible during the penalty phase, even if excluded by the rules of evidence during the guilt phase." *State v. Lafferty*, 2001 UT 19, ¶ 105, 20 P.3d 342. This standard enables a jury to "legitimately consider a defendant's character, future dangerousness, lack of remorse, and retribution" during the penalty phase. *State v. Young*, 853 P.2d 327, 353 (Utah 1993). Here, the photograph was offered to show the violent and brutal manner in which the defendant had killed an earlier victim. Obviously, the jury already knew about the manner in which defendant killed Blackmon. The defendant's willingness to commit extremely brutal and violent crimes was certainly a relevant factor for the jury to consider at sentencing. Thus, we conclude the trial court did not abuse its discretion in admitting the photograph.

¶ 41 Defendant makes three claims of error that were not objected to at trial. We review these claims for plain error.

 ¶ 42 Defendant contends that the evidence showing that no other homicides had ever occurred at the CUCF "had no bearing on the circumstances facing [defendant]" and was presumptively prejudicial. This evidence, however, was offered to undermine defendant's defense of "extreme emotional disturbance" at the time of the homicide.[10] In addition, the information regarding deaths in the prison was objective and readily ascertainable; it did not fall within the rule 403 category of statistical evidence that should be excluded for "not [being] susceptible to quantitative analysis. . . ." *State v. Lafferty*, 749 P.2d 1239, 1256 (Utah 1988). Accordingly, the evidence was not inherently prejudicial and was permissible under rule 403.

---

**8.** Mr. Colon testified that after witnessing the homicide, he heard defendant say, "That's white power. [I have] been killing' niggers ever since [I] was an bitty-bitty Aryan." Mr. Colon also testified that defendant and Daniels approached him prior to the trial and asked him to be a witness. Daniels wanted Mr. Colon to testify that Blackmon had possession of a shank during the attack.

**9.** Defendant shot this victim six times in the face at close range. The prosecution admitted the photograph into evidence during the penalty phase of the trial to inform the jury about defendant's history of committing brutal murders.

**10.** In order to show that defendant's belief that it was "kill [Blackmon] or be killed" was unreasonable, the prosecution introduced evidence that in the entire six-year history of the CUCF there had never been a murder committed by an inmate. Furthermore, other processes were in place to resolve inmate disputes. Defendant simply chose to ignore the established dispute resolution procedures that had worked in the prison over the preceding six years. It was the prosecution's argument that defendant would have known that prisoners simply did not kill other prisoners in the CUCF and so defendant could not have been under "extreme emotional disturbance" when he killed Blackmon.

¶ 43 Defendant next contends that evidence during the penalty phase regarding his affiliation with a white supremacist prison gang denied him his right to confrontation, violated his First and Fourteenth Amendment rights, and violated Utah state law. However, this evidence bore directly on the question of motive for Blackmon's killing, his premeditated intent, and on defendant's character, a mandatory element to be considered during a capital sentencing proceeding. *Id.* Therefore, it was properly admitted.

¶ 44 Finally, defendant maintains that allowing into evidence numerous prison disciplinary incident reports documenting his frequent violent and dangerous behavior directed towards prison guards and other inmates constituted hearsay and violated his right to confrontation. We disagree. Such evidence was highly probative of defendant's character and relevant for capital sentencing purposes. *See id.* Furthermore, everything contained in the reports had already been offered in sworn testimony by the prison officers who filled them out. Thus, defendant had an opportunity to cross examine each of the authors of the reports about the content of the reports. Further, any error in admitting the reports was harmless since the contents of the reports had already been testified to. The disciplinary reports were properly admitted.

## VI. WHETHER THE ALLEGED PROSECUTORIAL MISCONDUCT VIOLATED DEFENDANT'S RIGHTS TO DUE PROCESS OF LAW AND PROTECTION UNDER THE EIGHTH AMENDMENT

¶ 45 Defendant claims the prosecutor made comments in both the guilt [11] and penalty [12]

phases of the trial that tainted the fairness of the trial and violated his constitutional rights to due process of law and against cruel and unusual punishment. Because defendant did not object to the comments during the trial, we review this issue for plain error. *State v. Dunn*, 850 P.2d 1201, 1223–24 (Utah 1993).

¶ 46 With respect to the comments during the guilt phase, defendant argues the stories told by the prosecutor "drew the jurors' attention to a multitude of facts which were not in evidence, subject to confrontation, or proper for their consideration in reaching a verdict." While it is true that a prosecutor is not permitted in a closing argument to allude "to matters not introduced as evidence at trial," the statements at issue in this case were offered not as new factual matter, but simply as illustrations to make a conceptual point. *State v. Young*, 853 P.2d 327, 349 (Utah 1993). The accuracy of the prosecutor's anecdotes was not at issue; nor were they offered to introduce new evidence to the jury. Although perhaps ill-advised because of its personal nature, the prosecutor's narrative did not constitute misconduct or result in plain error.

¶ 47 As to the comments made during the penalty phase, defendant claims they were "factually and legally incorrect and minimized the ultimate seriousness of the jury's decision to be made in the penalty phase by indicating that Kell's actions had already determined his fate," citing *Caldwell v. Mississippi*, 472 U.S. 320, 328–29, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), in sup-

11. During the guilt phase the prosecutor told a story regarding the substantial hardships faced by his mother during her childhood, commenting that she had never killed anyone or gone to prison. The purpose of the story was to illustrate that defendant's "dysfunctional" childhood did not compel him to kill or justify his actions. The prosecutor concluded, "We all have dysfunction. Criminals don't have a corner on that market."

12. The prosecutor argued to the jury during the penalty phase:
I anticipate ... [the defense attorneys are] gonna come to you and they're going to say

that it is up to each of you, as to whether or not the death penalty is given in this case, and I say that decision, in reality, was made by Troy Kell when he decided on two different occasions to brutally/viciously take the life of another individual. He made that decision. Troy Kell is the reason why you are here. He is the reason why I am here. He made those decisions himself, and it's those decisions that Troy Kell made which, in fact, should make your decision. It's not your fault; its not mine. It's Troy Kell's fault.

port.[13] Defendant suggests an insupportable interpretation of the comments. It is obvious to us that the prosecutor was not suggesting that responsibility for determining the appropriateness of death rested with Kell himself. The prosecutor was merely placing the blame for this death-eligible killing on Kell's shoulders. The jury still had to make the decision regarding the imposition of the death penalty.

## VII. WHETHER THE TRIAL COURT ERRED IN REFUSING TO ALLOW THE JURY TO CONSIDER MERCY AND SYMPATHY AS MITIGATING FACTORS DURING THE PENALTY PHASE

 ¶ 48 Defendant claims the trial court erred during the penalty phase of the trial by denying a jury instruction including mercy and sympathy as mitigating factors. Because defendant did not object to the instruction at the time of the trial, this claim is reviewed for plain error. *Dunn*, 850 P.2d at 1208–09.

¶ 49 Subsections (2) and (3) of section 76–3–207 of the Utah Code set forth what may be considered mitigating evidence during a capital sentencing proceeding.[14] The statute does not identify mercy or sympathy as mitigating factors. This court has addressed this issue in several previous cases.

¶ 50 In *Young*, we applied the standard articulated by the United States Supreme Court in *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), where "the Court upheld an antisympathy instruction because reliable, accurate, and nonarbitrary sentencing necessarily requires a 'moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence.'" *Young*, 853 P.2d at 363 (citations omitted). We adopted the reasoning of *Saffle* because "the federal constitution does not prohibit an antisympathy instruction, nor does it require an instruction that the jurors may be guided by mercy or sympathy." *Id.* Recently, we again followed this rationale in *State v. Lafferty*, holding that "while the federal constitution does not prohibit a 'no mercy' instruction, neither does it require an instruction that the jurors should be guided by mercy or sympathy." 2001 UT 19, ¶ 110, 20 P.3d 342 (citing *Young*, 853 P.2d at 362).

¶ 51 Defendant offers nothing new on this issue, and we see no justification for departing from our precedent. As we said previously, "[t]he careful effort in the sentencing

---

13. The prosecutor in *Caldwell* argued that the jury should "not ... view itself as determining whether the defendant would die, because a death sentence would be reviewed for correctness by the State Supreme Court." *Caldwell*, 472 U.S. at 323, 105 S.Ct. at 2636. The United States Supreme Court deemed the statements impermissible because they led the jury to believe that the responsibility for determining the appropriateness of death rested elsewhere, in the hands of the State Supreme Court.

14. They provide as follows:

(2) (a) In capital sentencing proceedings, evidence may be presented on: (I) the nature and circumstances of the crime;

(ii) the defendant's character, background, history, mental and physical condition;

(iii) the victim and the impact of the crime on the victim's family and community without comparison to other persons or victims; and

(iv) any other facts in aggravation or mitigation of the penalty that the court considers relevant to the sentence.

(b) Any evidence the court considers to have probative force may be received regardless of its admissibility under the exclusionary rules of evidence. The state's attorney and the defendant shall be permitted to present argument for or against the sentence of death.

(3) Aggravating circumstances include those outlined in Section 76–5–202. Mitigating circumstances include:

(a) the defendant has no significant history of prior criminal activity;

(b) the homicide was committed while the defendant was under the influence of mental or emotional disturbance;

(c) the defendant acted under duress or under the domination of another person;

(d) at the time of the homicide, the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirement of law was impaired as a result of mental disease, intoxication, or influence of drugs;

(e) the youth of the defendant at the time of the crime;

(f) the defendant was an accomplice in the homicide committed by another person and the defendant's participation was relatively minor; and

(g) any other fact in mitigation of the penalty.

Utah Code Ann. § 76–3–207(2) & (3)(1995).

proceeding to focus on evidence concerning the defendant's background, character, circumstances, and the nature of the crime committed is wasted if the jury is instructed to make a purely emotional decision instead of a reasoned response to the evidence presented." *Young*, 853 P.2d at 364.

## VIII. WHETHER THE VICTIM IMPACT EVIDENCE ADMITTED IN THIS CASE AND THE UTAH STATUTE THAT ALLOWS IT ARE UNCONSTITUTIONAL

¶ 52 Defendant contends that section 76–3–207(2)(a)(iii) of the Utah Code, which permits the admission of victim impact evidence during the penalty phase of a capital sentencing proceeding, is unconstitutional under federal and Utah constitutional law. Because this issue was not raised by the defense during the trial, we apply a plain error

standard of review. *Dunn*, 850 P.2d at 1208–09. Before treating the constitutional issue on its merits, we determine whether the victim impact evidence in this case [15] was prejudicial. If this potential error is not prejudicial, we need not reach the constitutional questions.

¶ 53 Although some of the Blackmon family's statements were not entirely relevant to the sentencing proceeding, neither were they particularly inflammatory or prejudicial. Notably, the statements did not ask for the death penalty, but left the decision up to the jury in remarkably neutral terms. In fact, the family specified that they would respect any decision the jury made. We also note that during the guilt phase the jury had heard considerable testimony portraying Blackmon as an aggressive and dangerous prisoner,[16] and his family's comments served to balance that view.[17]

15. During the penalty phase, Blackmon's brother Larry was permitted to read the following prepared statement to the jury:

Ladies and gentlemen of the jury, the family of Lennie Blackmon, consisting of two daughters, Latrine and Cody Blackmon, mother, Mrs. Minnie Blackmon, father Mr. Paul Blackmon, Sr., brothers Larry Blackmon, Paul Blackmon, Jr., Kenneth Blackmon and Dane Blackmon, sister Pamela Blackmon, who preceded Lennie in death, would like you to know that we have suffered a terrible loss, due to the grave injustice that has occurred here in this state correctional facility. The manner in which Lennie's life was taken has left a tremendous void in each of our lives, especially his two daughters. We understand that Lennie was incarcerated here in this facility for crimes committed, but there is no reason for his life to be taken by the hands of another inmate or in any other manner.

Our mother was unable to make this trip because my grandmother has Alzheimer's and she, being the sole person that takes care of her, didn't want to leave my grandmother with someone with no experience in that area. However, in her absence she has asked me to tell you that after hearing of my brother's murder, she was unable to eat or sleep for months. She was haunted by nightmares, dreaming or [sic] and reliving the murder over and over again. She collapsed during the funeral and had to be carried out of the church. She was having a hard time breathing.

My mother has suffered from acute arthritis and high blood pressure for many years and this unfortunate incident has only served to aggravate and elevate her illness.

My father's mother, Mrs. Mildred Blackmon, was devastated, as was all of our aunts, uncles, cousins, nieces and nephews.

One of the reasons this has made such an impact on my family is because we have suffered through the murder of my sister Debra in 1991. It is hard enough to lose one loved one, but to lose a second child by the hands of a murderer is almost unbearable. By the grace of [God my family has been able to maintain some sense of purpose.

Lennie loved his mother and his daughters, as well as the rest of the family, without reservation and we love him and miss him very much.

Concerning the penalty phase for this individual, the family has an abiding conviction that man's laws were written for the unjust and for evildoers. Therefore whatever punishment is meted out by this Court or this jury, whether it be the death penalty or some other sentence, my family will accept that ruling.

16. *See, e.g.*, James Madsen's testimony (indicating that in prison Blackmon "was looking for a reputation as a 'bad as'" and had repeatedly threatened defendant from his cell); Robert Long's testimony (indicating that in Arkansas Blackmon was a "strong armed type" and "had a potential for violence"); Richard Kimberly's testimony (indicating that Blackmon was a member of the "Chips" gang and another militant organization); Lennie Case's testimony (indicating that the racial tension at the CUCF elevated when Blackmon arrived from Arkansas).

17. We note that New Jersey has addressed this issue and formulated a working model for admitting victim impact evidence. In *State v. Muham-*

¶54 We conclude that the victim impact evidence in this case was moderate in tone, descriptive of the family's loss and mourning but not militant or angry, and contained no effort to pressure the jury to impose the death penalty. Absent its presence in the penalty phase, we see no possibility that the jury's verdict would have been different, based as it clearly was on the acts and character of the defendant. Therefore, we decline to reverse the result of the penalty phase and do not need to address the constitutional questions.

## IX. WHETHER SECTION 76–5–202 OF THE UTAH CODE IS UNCONSTITUTIONALLY VAGUE ON ITS FACE

¶55 Defendant asserts that section 76–5–202(1)(q) of the Utah Code, which describes the aggravating factors that render murder eligible for the death penalty, is unconstitutionally vague on its face. Defendant argues that the language, "the homicide was committed in an especially heinous, atrocious, cruel, or exceptionally depraved manner, any of which must be demonstrated by physical torture, serious physical abuse, or serious bodily injury" describes all murders, thereby not narrowing the class of death-eligible murders. Utah Code Ann. § 76–5–202(1)(q) (1995). The constitutionality of a statute is a question of law reviewed for correctness. *E.g., State v. One 1980 Cadillac,* 2001 UT 26, ¶8, 21 P.3d 212.

¶56 This court addressed and rejected an identical argument in *State v. Tuttle,* 780 P.2d 1203, 1215–19 (Utah 1989). In *Tuttle,* we explained that when subsection (q) is read too literally, it describes all murders "not resulting in instantaneous death," thus becoming unconstitutionally vague. *Id.* at 1216. However, we concluded that subsection (q) can be construed "in a manner consistent with the federal constitution's re-

quirements without doing violence to the legislature's intent." *Id.* at 1217. Accordingly, to meet the requirements of subsection (q), the State must prove "not only serious physical abuse [or serious bodily injury] before death, but also that any such abuse [or injury] evidence a mental state materially more depraved or culpable than that of most other murders ... [and] the physical abuse [or injury] must be qualitatively and quantitatively different and more culpable than that necessary to accomplish the murder." *Id.* at 1217.

¶57 In this case, the facts show that defendant tortured Blackmon. The forensic examiner testified that the twenty-six stab wounds inflicted on Blackmon's face and eyes could cause only physical torture, serious physical abuse, or serious bodily injury, not death. She also testified that the wounds would have been excruciatingly painful. This testimony clearly satisfies the standard found in subsection (q); this homicide was committed in an "especially heinous, atrocious, cruel, or exceptionally depraved manner ... demonstrated by physical torture, serious physical abuse, or serious bodily injury." Utah Code Ann. § 76–5–202(1)(q) (1995). Thus, we reaffirm our holding in *Tuttle,* concluding that subsection (q) of the Utah Code is constitutional.

## X. WHETHER UTAH'S DEATH PENALTY STATUTES ARE UNCONSTITUTIONAL BECAUSE THEY DO NOT NARROW THE CLASS OF DEATH–ELIGIBLE MURDERS

¶58 Defendant claims that Utah's death penalty statutes are unconstitutional because they do not narrow the class of death-eligible murders. The constitutionality of a statute is a question of law reviewed for correctness. *E.g., One 1980 Cadillac,* 2001 UT 26 at ¶8, 21 P.3d 212.

*mad,* 145 N.J. 23, 678 A.2d 164 (1996), the Supreme Court of New Jersey concluded that victim impact evidence is admissible in penalty phase proceedings when the content of such testimony is strictly constrained as to avoid the possibility of including any statements that would unfairly prejudice the defendant. *Id.* at 45, 678 A.2d 164. Accordingly, testimony show-

ing the impact of the murder on the victim's family and the uniqueness of the individual can be introduced to aid the jury in seeing the victim as an individual human being rather than a "faceless stranger," but "unduly inflammatory commentary" will never be allowed because of its unfair prejudicial effects. *Id.* at 48, 678 A.2d 164.

¶ 59 We have addressed this issue on numerous occasions, concluding that Utah's death penalty statutes are constitutional. *See, e.g., Lafferty,* 2001 UT 19, ¶¶ 113, 141, 20 P.3d 342; *State v. Lovell,* 1999 UT 40, ¶ 38, 984 P.2d 382; *Young,* 853 P.2d at 337–38; *State v. Holland,* 777 P.2d 1019, 1028 (Utah 1989); *State v. Tillman,* 750 P.2d 546, 562 (Utah 1987); *State v. Wood,* 648 P.2d 71, 81–83 (Utah 1982). Nothing in this case raises grounds for re-examining our substantial body of precedent regarding this issue.

## XI. WHETHER THE CAPITAL SENTENCING PROCEEDINGS WERE FLAWED AND WHETHER THE COURT SHOULD CEASE PERFORMING HARMLESS ERROR REVIEW OF PENALTY PHASE ERRORS

¶ 60 Defendant claims there were penalty phase errors and asks this court to remand the case for a new penalty phase hearing rather than perform a review for harmless error, which is the current standard for capital sentencing proceedings. Because we have not found errors in the penalty phase of this trial, this argument is moot and we do not address it.

## XII. WHETHER CONDUCTING THE TRIAL FOLLOWING PRISON DISCIPLINARY PROCEEDINGS VIOLATED STATE AND FEDERAL CONSTITUTIONAL DOUBLE JEOPARDY PROVISIONS

¶ 61 Defendant asserts that because he was punished in a prison disciplinary proceeding for killing Blackmon, his subsequent criminal trial violated state and federal double jeopardy provisions. This issue involves a question of law that we review for correctness. *E.g., One 1980 Cadillac,* 2001 UT 26 at ¶ 8, 21 P.3d 212.

¶ 62 Given the well-established federal and state caselaw on this issue, defendant's argument is frivolous. Virtually every federal circuit court of appeals has held that prison disciplinary proceedings do not violate the double jeopardy provisions of the Fifth Amendment of the United States Constitution. *See, e.g., United States v. Mayes,* 158 F.3d 1215, 1220 (11th Cir.1998) (ruling that imposing prison sanctions after a riot did not preclude criminal prosecution); *United States v. Brown,* 59 F.3d 102, 105 (9th Cir.1995) (ruling that parole revocation, disciplinary transfer, and loss of good time credits did not violate double jeopardy); *United States v. Hernandez–Fundora,* 58 F.3d 802, 806–08 (2d Cir.1995) (ruling that a 45-day disciplinary segregation did not constitute punishment for double jeopardy purposes); *Garrity v. Fiedler,* 41 F.3d 1150, 1152 (7th Cir.1994) (ruling that disciplinary segregation for offense did not bar criminal prosecution of same offense); *United States v. Newby,* 11 F.3d 1143, 1144–45 (3d Cir. 1993) (ruling that disciplinary segregation and transfer did not act as bar to prosecution); *United States v. Rising,* 867 F.2d 1255, 1259 (10th Cir.1989) (ruling that administrative punishment of prisoner for killing a fellow inmate did not bar criminal prosecution for the killing); *Kerns v. Parratt,* 672 F.2d 690, 691–92 (8th Cir.1982) (ruling that criminal prosecution was not barred after one prisoner was disciplined for attacking another prisoner); *Fano v. Meachum,* 520 F.2d 374, 376 n. 1 (1st Cir.1975) (supporting rule that prison disciplinary proceedings did not violate double jeopardy provisions); *United States v. Lepiscopo,* 429 F.2d 258, 261 (5th Cir.1970) (ruling that an inmate could be prosecuted for attempted escape even after receiving solitary confinement and loss of good time credits); *Hamrick v. Peyton,* 349 F.2d 370, 372 (4th Cir. 1965) (ruling that loss of good time credit following several escapes from prison did not act as a violation of double jeopardy); *Gibson v. United States,* 161 F.2d 973, 974 (6th Cir.1947) (ruling that loss of good time credits did not violate double jeopardy). This court has also held that prison disciplinary proceedings have no effect on the double jeopardy provision. *See, e.g., State v. Menzies,* 601 P.2d 925, 926 (Utah 1979); *State v. Bullock,* 589 P.2d 777 (Utah 1979). Thus, defendant's contention that holding a trial following prison disciplinary proceedings violates the double jeopardy provisions of the Fifth Amendment is without merit.

## CONCLUSION

¶ 63 Defendant was not denied the right to a public trial, to the presumption of innocence, to a fair trial, or to equal protection by being tried in the courtroom at the CUCF. The trial court did not abuse its discretion or deny defendant the right to a fair trial as a result of the jury voir dire process. The trial court's failure to instruct the jury on the lesser included offense of imperfect self-defense manslaughter was not erroneous. The trial court did not err in allowing the jury to view a videotape of the homicide. If any evidentiary errors occurred during the guilt and penalty phases of the trial, they were harmless. The prosecutor's arguments to the jury did not violate the Eighth Amendment of the United States Constitution. The jury did not have to consider mercy and sympathy as mitigating factors during the penalty phase of the trial. Admitting victim impact evidence in this case was harmless. Section 76–5–202 of the Utah Code is not unconstitutional. Utah's death penalty statutes are not unconstitutional. The capital sentencing proceedings were not flawed. Prison disciplinary proceedings do not preclude criminal prosecution of the same crime and do not violate the double jeopardy provisions of the Fifth Amendment of the United States Constitution.

¶ 64 The court has reviewed all of defendant's other claims and find them meritless. We affirm his conviction and sentence.

¶ 65 Chief Justice HOWE, Associate Chief Justice RUSSON, Justice DURRANT, and Justice WILKINS concur in Justice DURHAM's opinion.