*This opinion is subject to revision before final publication in the Pacific Reporter*

**2018 UT 60**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

MARK ANTHONY BEVERLY,
*Appellant.*

No. 20160511
Filed November 29, 2018

On Direct Appeal

Third District, Salt Lake
The Honorable Mark S. Kouris
No. 141909114

Attorneys:

Sean D. Reyes, Att'y Gen., Jeffrey D. Mann, Asst. Solic. Gen.,
Salt Lake City, for appellee

Nathalie S. Skibine, Salt Lake City, for appellant

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which
ASSOCIATE CHIEF JUSTICE LEE, JUSTICE HIMONAS, JUSTICE PEARCE, and
JUSTICE PETERSEN joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

## Introduction

¶1 Mark Anthony Beverly was convicted of rape and forcible sexual assault of his wife. He claims the two had consensual sex.

¶2 After a period of separation, Mr. Beverly moved into his wife's home, where he slept on her couch, because he had nowhere else to go. One night he became enraged, entered his wife's room, slammed the door, and demanded that she have sex with him. She refused his demands multiple times and cried during the incident. Eventually, she followed his instructions and engaged in sexual

conduct. Immediately afterward, she notified the police that she had been raped and Mr. Beverly was arrested.

¶3 He now appeals his conviction on several grounds. First, he claims the trial judge violated his constitutional rights by commenting on the outcome of the O.J. Simpson trial to potential jury members during voir dire. Second, he claims the trial court abused its discretion in excluding evidence suggesting the possibility that his wife had sex with another man before the alleged rape occurred. Third, he claims the trial court abused its discretion when it admitted evidence about Mr. Beverly's domestic violence in the past, and when it precluded him from asking about specific details of those instances on cross-examination. Finally, he argues that all the errors in this case cumulatively warrant reversal.

¶4 We disagree with each of his contentions. Mr. Beverly's constitutional challenge to the trial judge's comments during jury selection fails because it was not preserved below and he does not meet an exception to preservation. Additionally, the trial court did not abuse its discretion in excluding evidence about a possible second sexual partner, because it was offered for the incorrect purpose of impeaching the wife and would have been highly prejudicial. Furthermore, the trial court's decision to admit instances of Mr. Beverly's domestic violence against his wife was correct because it was offered for a plausible, non-propensity purpose and the court did not abuse its discretion in limiting the scope of cross-examination on these incidents. And lastly, the cumulative error doctrine does not apply, because only a single error occurred below. Accordingly, we affirm.

### Background[1]

¶5 In August 2014, Mr. Beverly had been married to his wife, S.B., for over twenty years. They had two children together, both of whom lived with S.B. Mr. Beverly and S.B.'s marriage was "very volatile." The two experienced periods of separation, and Mr. Beverly had been kicked out of the house on a few occasions. A

---

[1] "In reviewing a jury verdict, we view the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict." *State v. Boyd*, 2001 UT 30, ¶ 2, 25 P.3d 985 (quoting *State v. Hopkins*, 1999 UT 98, ¶ 2, 989 P.2d 1065). We recite the facts accordingly.

few months before the incident, S.B. allowed Mr. Beverly to move back in and sleep on her couch because he had nowhere else to live. At that time, the two had not had a physical relationship for about two years.

¶6 On August 12, 2014, Mr. Beverly returned to S.B.'s house after being gone for several days. He was "very angry" and accused S.B. of cheating on him. He called her a "whore" and a "bitch" and yelled at her for sleeping away from him in a different room. S.B. then left for her work, where Mr. Beverly showed up a few minutes later and again began accusing her of cheating on him. He demanded to see S.B.'s emails, which she showed to him, and he eventually left.

¶7 That evening, S.B. returned home to find Mr. Beverly even angrier. She told her two sons to go to bed because "Dad's on one." She then retired to her own room. When she was almost asleep, Mr. Beverly came into her room, slammed the door, and said, "you're having sex with me tonight." She replied, "no, I'm not."

¶8 One of the sons, having heard the door slam, came out of his room to make sure Mr. Beverly wasn't hurting S.B. The son listened outside S.B.'s door for a few seconds and returned to his room.

¶9 Mr. Beverly then took off his clothes and instructed S.B. to take hers off as well. She refused and began to cry. He then told S.B. to touch him and tell him she missed him and loved him. She eventually followed his instructions. He proceeded to touch her breasts and vagina with his hands while she cried quietly. He also got on top of S.B. and penetrated her vagina with his penis. She continued to cry. During this incident, he told her to "shut up, bitch," but then would say things like, "I miss you, I love you, tell me you love me." At one point he also said, "I should tie you up and let a bunch of . . . mother F'ers fuck you."

¶10 Mr. Beverly ejaculated inside of S.B.'s vagina before climbing off of her. Not wanting to anger Mr. Beverly further, S.B. waited until he fell asleep and then called 9-1-1 to report that she had been raped. Law enforcement arrived and arrested Mr. Beverly. After his arrest, S.B. was interviewed by an officer from the Unified Police Department. She also underwent a sexual assault examination by a trained nurse.

¶11 Shortly after his arrest, Mr. Beverly was also interviewed by an officer. During the interview, Mr. Beverly stated that he had "penetrated [S.B.'s] vagina with his penis, [and] that he touched her breasts and her vagina with his hand." He "acknowledged that [S.B.]

had said 'no' … more than on[c]e," but that he had asked permission to kiss her, touch her legs, and rub her back and she said "yes." He also said that during sex "she was crying, and it was upsetting him, because at one point they used to be so close," and that "he would yell, 'why—why are you crying? Why are you crying?'" He then explained to the officer that he had told S.B. that "your pussy is mine and I'm going to have it." He also stated in front of another officer that "it's a wife's responsibility under the law of God, and he's allowed to have sex with his wife," that it was the "right of a man to turn her on," and that "if he took time he could get her into the mood."

¶12 Mr. Beverly was subsequently charged with rape, a first degree felony; forcible sexual abuse, a second degree felony; and domestic violence in the presence of a child, a class B misdemeanor.

*Testimony Concerning the Choking Incidents*

¶13 At a preliminary hearing, S.B. testified that Mr. Beverly had committed prior acts of domestic abuse against her. Specifically, she testified that he had choked her on two specific occasions, once in November 1993 and the other in December 2004, and that he had threatened to kill her in the past. Following the hearing, the prosecution moved to admit these prior acts of domestic violence at trial to explain the wife's conduct and state of mind during the alleged rape. The trial court granted the prosecution's motion and admitted the evidence, concluding "that the proposed evidence is being offered for a non-character purpose that is relevant to this matter"—to show whether "the alleged victim was overcome by her fear for her safety" and "to demonstrate the victim's state of mind during the sexual assault."

¶14 At trial, S.B. testified on direct examination that "[there had] been some times where [Mr. Beverly] physically harmed me, he's choked me or threatened to kill me." S.B. did not testify about any specific instances of domestic abuse on direct. On cross, however, defense counsel proceeded to ask S.B. about the details of the November 1993 choking incident, but S.B. could not remember much besides the fact that she and Mr. Beverly were in a fight, and that he had choked her and threatened to kill her. Defense counsel then asked S.B. about an incident on New Year's Eve 1993. The prosecution objected and the trial court required that defense counsel's cross be limited to questions about the 2004 choking incident because the older incidents were "too old" and "no longer relevant." Defense counsel then proceeded to cross-examine S.B. about the 2004 incident, and S.B. admitted that she initiated an

argument before that incident because she "suspected [Mr. Beverly] was cheating."

*The Trial Court's Comments to Potential Members of the Jury*

¶15 Before trial, Mr. Beverly wrote a letter to the trial court asking the court to replace his appointed counsel because his counsel allegedly told him that he "must understand how 'you being black and she (my wife) is white how this will look'" to a jury. The trial court allowed Mr. Beverly's counsel to withdraw and appointed him new counsel.

¶16 During the jury selection process, the trial judge spoke to the jury pool to pass the time while counsel for both sides reviewed the jury list. The judge explained to the jury pool the jury selection process and different strategies parties use when selecting a jury. He mentioned that many of these selection strategies, in his opinion, "border[] on witchcraft." He then proceeded to give an example of a selection strategy:

> For instance, in the O.J. Simpson trial, which a lot of you obviously know about, the defense lawyers at that time paid some firm $150,000. And what the firm would do is they would pull people off of the street and then read them different arguments, and see how they reacted to those arguments. And then they gave the lawyers this perfect demographic of what the jury should look like so they would do well in trial.

The judge then explained how, in his experience as a prosecutor and as a defense lawyer, he believed "the whole [selection strategy] is baloney," and "that if I found a person that was open minded, that hadn't had an experience similar to something like this," and was "intelligent," that he "always got a very good verdict that way."

¶17 The judge then described the evolution of Anglo-American jurisprudence, focusing on how cultures have determined guilt in the past. He spoke of early methods of sword fighting, burning the accused with a hot iron, casting alleged witches in ponds to see if they would float, the early stages of judges and juries, and, finally, the current system in America. He explained that counsel for both sides in this case were asking so many questions to members of the jury pool in order to "make sure that none of you knew anything about this case" and "because we want it to be a fair trial for both sides." He contrasted this process with Russia, where he said the people don't trust the judicial system and it has become "effectively

a cash system." He stated that he believed that Russia was "unlike our system."

¶18 The judge then noted that "we read on occasion about these trials that go awry." He proceeded to use the O.J. Simpson trial as an example: "for instance, in my opinion, at least, the O.J. [Simpson] trial and other trials like that, that kind of go off course. And the reason we hear about those is because it is so unusual to our—for our system to completely fail like that." He emphasized that "[l]iterally, there are thousands of trials that go every day. And yet, at the end of the year . . . you'd be hard pressed to find 10 of them that have gone so far off the tracks that something has gone wrong." He concluded his remarks by expressing his faith in our judicial system and the great experience this would be for each person who participated. Mr. Beverly's counsel did not object to any of the judge's statements during the selection process.

*The DNA Evidence*

¶19 On the second day of trial, the State called a forensic scientist from the Utah State Crime Lab who testified that the seminal samples from the vaginal swab performed in S.B.'s sexual assault exam contained a mixture of major and minor DNA profiles. The scientist stated that the major profile matched Mr. Beverly, but the minor profile was inconclusive because "[t]he information was so low that we can't even make a comparison to even know if there's a match." On cross-examination, defense counsel asked about the two DNA profiles and focused his questions on the fact that they were from two different people. The scientist testified that it is clear that "there was DNA from two separate individuals." But on redirect, he noted that the minor profile may have been S.B.'s vaginal cells, but that was not certain.

¶20 The State then raised a concern that defense counsel was inviting the jury to speculate that the minor profile was another male's sperm, which the prosecution claimed violated rule 412 of the Utah Rules of Evidence. Defense counsel argued that he should be able to address the possibility of another seminal source to show that S.B. "made a false statement under oath, because she had lied about whether or not she was having [a] sexual relationship with someone else." The trial court rejected this argument, stating that attacking S.B.'s "credibility about her sexual life . . . would be precluded under 412." The trial court also found that defense counsel's proposed use of the minor profile did not pass a rule 403 balancing test.

¶21 The jury subsequently found Mr. Beverly guilty of rape and forcible sexual abuse. They acquitted him on the charge of domestic

violence in the presence of a child. Mr. Beverly timely appealed to this court. We initially transferred the case to the court of appeals under Utah Code section 78A-3-102(4). Subsequently, we vacated the order transferring the case to the court of appeals and recalled the case. We have jurisdiction under Utah Code section 78A-3-102(3)(i).

## Analysis

¶22 Mr. Beverly raises four arguments on appeal. First, he argues that the trial judge's comments to the jury pool regarding the O.J. Simpson trial violated his constitutional rights. But he did not preserve this argument below. Generally speaking, "[w]e . . . will not consider an issue unless it has been preserved for appeal."[2] But "[t]his court has recognized three distinct exceptions to preservation: plain error, ineffective assistance of counsel, and exceptional circumstances."[3] Thus, Mr. Beverly "must establish the applicability of one of these exceptions to persuade an appellate court to reach that issue."[4] He has not shown that an exception applies, and so we decline to address his argument regarding the trial judge's comments.

¶23 Second, he argues that the trial court erred when it excluded, under rules 412 and 403 of the Utah Rules of Evidence, his proposed use of the minor DNA profile evidence to show the possibility of a second sexual partner. "With regard to the admission of evidence, most decisions involve a threshold statement of the legal principle governing admission or exclusion, findings of facts pertinent to a determination, and the application of the legal principle to the facts at hand with regard to admissibility."[5] "We review the legal questions to make the determination of admissibility for correctness."[6] "We review the questions of fact for clear error."[7] We review application of legal principles to the facts of a case under an abuse of discretion standard.[8] A trial court's ruling

---

[2] *Patterson v. Patterson*, 2011 UT 68, ¶ 12, 266 P.3d 828.

[3] *State v. Johnson*, 2017 UT 76, ¶ 19, 416 P.3d 443.

[4] *Id.*

[5] *Arnold v. Grigsby*, 2018 UT 14, ¶ 9, 417 P.3d 606.

[6] *Id.* (citation omitted) (internal quotation marks omitted).

[7] *Id.* (citation omitted) (internal quotation marks omitted).

[8] *Id.*

on the admissibility of evidence is an application of legal principles to fact. Thus, "we review the [trial] court's ruling on admissibility for abuse of discretion."[9] So a trial court's decision to admit or exclude evidence under rule 412 is reviewed under an abuse of discretion standard.[10] Similarly, we review a trial court's decision to admit or exclude evidence under rule 403 for an abuse of discretion.[11] We hold that the trial court did not abuse its discretion here.

¶24 Third, Mr. Beverly argues that the trial court erred when it admitted evidence of his prior bad acts under rule 404(b) of the Utah Rules of Evidence, and when it prohibited Mr. Beverly from cross-examining S.B. about the 1993 New Year's Eve incident. We review a trial court's admission of prior bad acts under an abuse of discretion standard.[12] Similarly, "[t]rial courts have 'broad discretion in restricting the scope of cross-examination, and on appeal the trial court's ruling . . . is reviewed under an abuse of discretion standard.'"[13] We hold that the trial court did not abuse its discretion here.

¶25 Finally, he argues that the cumulative effect of the trial court's alleged errors deprived him of a fair trial. We will not reverse a conviction under the cumulative error doctrine unless "the cumulative effect of the several errors undermines our confidence . . . that a fair trial was had."[14] Because he has demonstrated only a single potential error,[15] we hold that the

---

[9] *Id.* (alteration in original) (citation omitted) (internal quotation marks omitted).

[10] *State v. Tarrats*, 2005 UT 50, ¶ 16, 122 P.3d 581.

[11] *State v. Kell*, 2002 UT 106, ¶ 32, 61 P.3d 1019.

[12] *State v. Thornton*, 2017 UT 9, ¶ 56, 391 P.3d 1016.

[13] *Tarrats*, 2005 UT 50, ¶ 16 (second alteration in original) (citation omitted).

[14] *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993) (alteration in original) (citation omitted) (internal quotation marks omitted).

[15] Although Mr. Beverly alleges a number of errors, we conclude that all but one of those errors did not constitute an actual error. Because we resolve the remaining alleged error — trial counsel's failure to object to the judge's comments to the jury — on the ground that it did not result in sufficient prejudice, we need not determine whether it constituted an actual error.

cumulative error doctrine cannot be applied in this case. Accordingly, we affirm his convictions.

## I. The Trial Judge's Comments to the Jury Pool

¶26 Mr. Beverly first argues that the trial court erred when it voiced its disapproval of the outcome of the O.J. Simpson trial to the members of the jury pool during jury selection. Specifically, he asserts that the trial court's statements violated his rights under the U.S. and Utah constitutions to a trial "by an impartial jury" and to "due process."[16] But he failed to preserve these arguments below. So he may attack the trial judge's comments only under one of the three exceptions to the rule of preservation—ineffective assistance of counsel, plain error, or extraordinary circumstances. We hold, however, that he failed to meet any of these three exceptions and so his argument fails.

¶27 Under Utah law, "parties are required to raise and argue an issue in the trial court 'in such a way that the court has an opportunity to rule on [it].'"[17] If they fail to raise an argument below, we generally will not reach it on appeal.[18] We refer to this principle as our rule of preservation.[19] We have recognized, however, three exceptions to this rule: ineffective assistance of counsel, plain error, and exceptional circumstances.[20] Thus, "[w]hen an issue is not preserved in the trial court, but a party seeks to raise it on appeal, the party must establish the applicability of one of these exceptions to persuade an appellate court to reach that issue."[21] Mr. Beverly has asserted each of these exceptions, so we review each one separately.

---

[16] He also claims that the trial judge's comments violated rule 19(f) of the Utah Rules of Criminal Procedure and rule 1.2 of the Utah Code of Judicial Conduct.

[17] *State v. Johnson*, 2017 UT 76, ¶ 18, 416 P.3d 443 (alteration in original) (citation omitted).

[18] *Id.*

[19] *See, e.g., State v. Jones*, 2015 UT 19, ¶ 49, 345 P.3d 1195.

[20] *Johnson*, 2017 UT 76, ¶ 19.

[21] *Id.*

## A. Ineffective Assistance of Counsel

¶28 Mr. Beverly argues that this court may review his unpreserved challenge to the trial court's comments during jury selection under his ineffective assistance of counsel claim. In order to establish ineffective assistance of counsel, Mr. Beverly is required "to meet 'the heavy burden of showing that (1) trial counsel rendered deficient performance which fell below an objective standard of reasonable professional judgment, and (2) counsel's deficient performance prejudiced him.'"[22] Because he cannot show that he was prejudiced, Mr. Beverly fails to carry this burden.

¶29 Mr. Beverly argues that the trial judge's "remarks were inflammatory and misleading" and that "[c]ounsel should have objected to the remarks at a time when another jury could be empaneled." He argues, in effect, that in failing to object his counsel fell below an objective standard of reasonable professional judgment. The State argues, however, that we should "presume that counsel has rendered adequate assistance"[23] and, as such, Mr. Beverly must "persuad[e] the court that there was no 'conceivable tactical basis for counsel's actions.'"[24] The State claims that a reasonably prudent attorney, upon hearing the trial judge's remarks, would intentionally choose not to object to the remarks in order to avoid drawing the jury's attention to them or their potential significance. In other words, the State argues that there is a sound strategic tactic behind trial counsel's failure to object. And because there is a sound strategic tactic for not objecting, the State contends that Mr. Beverly cannot show that his counsel was deficient in failing to object. But because Mr. Beverly cannot show prejudice, we do not address whether his trial counsel's performance was deficient.

¶30 "To show prejudice in the ineffective assistance of counsel context, the defendant bears the burden of proving that counsel's

---

[22] *State v. Roth*, 2001 UT 103, ¶ 5, 37 P.3d 1099 (citation omitted).

[23] *See State v. Parker*, 2000 UT 51, ¶ 10, 4 P.3d 778 (citation omitted) (internal quotation marks omitted).

[24] *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 (emphasis omitted) (citation omitted); *see also State v. Dunn*, 850 P.2d 1201, 1225 (Utah 1993) ("[I]f the challenged act or omission might be considered sound trial strategy, we will not find that it demonstrates inadequacy of counsel.").

errors actually had an adverse effect on the defense and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different."[25] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[26] "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."[27] This is so because "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect."[28] Thus, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."[29]

¶31 Here, Mr. Beverly cannot show that, but for his trial counsel's deficient performance, there is a reasonable probability that he would have been acquitted, because the overwhelming, undisputed evidence on the record supports the jury's conviction in this case. For example, it is undisputed that S.B. and Mr. Beverly had not had a physical relationship in two years prior to the incident and that on August 13, 2014, he was very angry, went into S.B's room, slammed the door, and stated "you're having sex with me tonight." It is also undisputed that S.B. said "no" more than once to Mr. Beverly's demands, that he had sexual intercourse with her, that she was crying during the incident, and that she immediately called 9-1-1 thereafter. Mr. Beverly never challenged the truth of any of these asserted facts. In fact, as the officer who interviewed him testified, Mr. Beverly voluntarily told the officer that he had sex with S.B., that she had said "no" more than once, and that she was crying during the incident. And nothing in the record undermines this testimony.

¶32 Also, even Mr. Beverly's own witness did not cast much doubt on the issue of consent. In his defense at trial, Mr. Beverly called only one witness—his sister, Candy Brown. On direct,

---

[25] *State v. Moore*, 2012 UT 62, ¶ 29 n.5, 289 P.3d 487 (Lee, J., dissenting) (citation omitted) (internal quotation marks omitted).

[26] *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

[27] *Id.* at 695.

[28] *Id.* at 695–96.

[29] *Id.* at 696.

Ms. Brown testified that S.B. called her the morning after the alleged rape and that S.B. used the phrase "one thing led to another" to describe the incident with Mr. Beverly. Ms. Brown also testified that S.B. told Ms. Brown that Mr. Beverly had "sexually assaulted" her, that she became upset when Mr. Beverly called her "the B word" during intercourse, and that she had thought about calling the police upon hearing that word. Even if these statements could be construed to in some way support Mr. Beverly's assertion that the couple engaged in consensual sex, Ms. Brown's statements on cross contradict this notion.

¶33  On cross, she also testified that S.B. told her, in addition to stating that "one thing led to another," that Mr. Beverly "had raped her." In fact, during Ms. Brown's direct examination, she had testified that after S.B. told her about the incident, she asked S.B. "why didn't you scream or something?," to which S.B. replied, "I didn't want to arouse the boys, they were down the hall." And, when asked on cross-examination if "the impression that [Ms. Brown] had [from S.B.'s remarks on the phone was] that she had fabricated this rape allegation," Ms. Brown replied "No," and stated that S.B. "didn't say that it was consensual. She said, one thing led to another." This testimony shows that S.B. called Ms. Brown the day after the incident, told her she was raped by Mr. Beverly, and that even Ms. Brown did not believe S.B. was fabricating her claims.

¶34  Given the overwhelming and undisputed evidence admitted at trial, it is not reasonably likely the jury would have acquitted Mr. Beverly if his trial counsel had objected to the trial judge's comments during jury selection. Because most of the material facts were undisputed, Mr. Beverly likely would have been found guilty regardless of such comments. Thus, he cannot show a reasonable probability of a different outcome in this case.

¶35  Accordingly, we will not disturb the jury verdict under his ineffective assistance of counsel claim.

### B. Plain Error

¶36 Mr. Beverly also argues that the trial court's comments constituted plain error. But, as we have already addressed, the judge's comments did not cause him prejudice. Because he has not shown that the trial court's error was harmful, he has failed to establish that the trial judge's comments constituted plain error.

¶37 "'To demonstrate plain error, a defendant must establish that '(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful. . . .' If any one of these

requirements is not met, plain error is not established."[30] An error is obvious to the trial court when the party relying on plain error "'show[s] that the law governing the error was clear,' or 'plainly settled' at the time the alleged error was made."[31] An error is harmful when the same party shows that the error is "of such a magnitude that there is a reasonable likelihood of a more favorable outcome for the defendant."[32] In other words, the party must show that "there is a 'reasonable probability' that, 'but for the alleged error,' the outcome in the case would have been different."[33] This means "that the prejudice test is the same whether under the claim of ineffective assistance or plain error."[34] Mr. Beverly fails this test.

¶38 Mr. Beverly argues that the trial judge committed plain error in making certain comments to the jury pool at the beginning of trial. The judge stated he believed that the jury in the O.J. Simpson trial went "off course," and that that trial was an example of the judicial system "completely fail[ing]." Mr. Beverly makes a strong argument that these comments constituted error. The O.J Simpson trial was of such notoriety that simply mentioning the case could inflame passions and ignite conscious or subconscious biases. This is particularly true here, in a case with a racial dynamic similar to the one present in the O.J. Simpson trial in which a black man was accused of murdering his white wife.

¶39 Because the risk of prejudicing the parties is high in circumstances such as this, judges should steer clear of remarking upon infamous cases and their results, particularly when such a case is factually similar to the case the potential jury members will be reviewing. These types of comments are problematic because they have the potential to do serious harm by confusing jurors, inflaming their passions, and causing them to question a judge's impartiality.

---

[30] *Johnson*, 2017 UT 76, ¶ 20 (alterations in original) (citations omitted).

[31] *Id.* ¶ 21 (citations omitted).

[32] *Id.* (citations omitted) (internal quotation marks omitted).

[33] *Id.* (citations omitted).

[34] *State v. McNeil*, 2016 UT 3, ¶ 29, 365 P.3d 699; *see also Parker*, 2000 UT 51, ¶ 10 ("The prejudice test for ineffective assistance of counsel claims is equivalent to the harmfulness test applied in assessing plain error.").

But even though the trial court's comments in this case were concerning, we need not determine whether they constituted error or obvious error. This is so because Mr. Beverly fails to demonstrate that the comments resulted in prejudice.

¶40 Regardless of whether the trial judge's comments regarding O.J. Simpson constituted error, or whether such error was obvious, Mr. Beverly cannot show prejudice, and so he cannot show harm under his plain error claim. As shown above,[35] the overwhelming evidence of Mr. Beverly's guilt on the record makes it difficult to imagine him being acquitted of his charges in this case, whether or not the trial judge made improper statements about the O.J. Simpson case. In other words, the overwhelming weight of the evidence in support of Mr. Beverly's conviction leads us to conclude that the jury would have reached the same result even if the trial court had not made the comments. Because Mr. Beverly cannot show the trial judge's alleged error caused sufficient harm in this case, his plain error argument fails.

### C. Exceptional Circumstances

¶41 Lastly, Mr. Beverly argues that we may also review the trial court's comments under the exceptional circumstances doctrine. But because he cannot show that our failure to review his challenge would result in a manifest injustice, he fails on this point as well.

¶42 The exceptional circumstances exception "is a doctrine that 'applies to rare procedural anomalies.'"[36] We "apply this 'exception sparingly, reserving it for the most unusual circumstances where our failure to consider an issue that was not properly preserved for appeal would have resulted in manifest injustice.'"[37] In order for this court to review Mr. Beverly's challenge under this exception, he must therefore show that there was a rare procedural anomaly that resulted in manifest injustice.[38] But he has failed to satisfy this requirement.

---

[35] *Supra* ¶¶ 32–35.

[36] *Adoption of K.A.S.*, 2016 UT 55, ¶ 19, 390 P.3d 278 (citation omitted).

[37] *Id.* (citation omitted).

[38] *State v. Beck*, 2006 UT App 177, ¶ 9, 136 P.3d 1288 ("To establish 'extraordinary circumstances,' a defendant must establish that the error is the type of 'rare procedural anomal[y]' that, if left

(Continued)

¶43 Mr. Beverly argues that a rare procedural anomaly occurs when counsel is confronted with a situation where he must object to a trial court's comments. And he asserts that jury selection constitutes a "unique procedural circumstance[] where counsel was present but necessarily focused on selecting a jury rather than on the judge's comments to the jury." So he contends that "[j]udicial comments during jury selection create a rare procedural anomaly that, if left unreviewed, would result in manifest injustice." We disagree.

¶44 As stated above, given the overwhelming, undisputed evidence of his guilt in this case, Mr. Beverly cannot show he was prejudiced by the judge's comments. So even if the trial judge's comments constituted a rare procedural anomaly, he cannot show that this anomaly resulted "in manifest injustice."[39] Accordingly, we decline to review the trial judge's comments under the exceptional circumstance exception.

¶45 And because Mr. Beverly has failed to qualify for any exception to the rule of preservation, his challenge to the trial judge's comments fails.

## II. Rule 412 and the Minor DNA Profile

¶46 The second issue Mr. Beverly raises on appeal is whether the trial court erred in precluding him from using the minor DNA profile evidence to show the possibility of a second sexual partner. We hold that the trial court did not err for two reasons. First, at least one of Mr. Beverly's intended uses of the minor DNA profile was prohibited under rule 412 of the Utah Rules of Evidence. Second, the district court properly kept the evidence out under rule 403 because such evidence was highly prejudicial and offered little probative value. We discuss each reason below.

¶47 "Utah Rule of Evidence 412 broadly prohibits admission of 'evidence offered to prove that a victim engaged in other sexual behavior' or 'evidence offered to prove a victim's sexual predisposition.'"[40] It is meant to restrict the admission of "all

---

unreviewed, would result in manifest injustice." (alteration in original) (quoting *State v. Nelson–Waggoner*, 2004 UT 29, ¶ 23, 94 P.3d 186 (citation omitted))).

[39] *Adoption of K.A.S.*, 2016 UT 55, ¶ 19.

[40] *State v. Richardson*, 2013 UT 50, ¶ 19, 308 P.3d 526 (quoting UTAH R. EVID. 412(a)).

activities that involve actual physical conduct . . . or that imply sexual intercourse or sexual contact."[41] This rule "reflects the recognition that evidence of the victim's [sexual behavior] is ordinarily of no probative value on the issue of whether a rape or sexual assault occurred."[42] In fact, we have gone so far as stating that "an alleged victim's prior sexual conduct 'is simply not relevant to any issue in [a] rape prosecution.'"[43]

¶48 But listed in rule 412 itself are express exceptions to this broad prohibition. "[E]vidence of specific instances of a victim's sexual behavior" may be admissible "if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence."[44] And "evidence of specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct" may also be admissible "if offered by the defendant to prove consent or if offered by the prosecutor."[45] However, "[t]here is no exception in rule 412 that allows for the admission of past sexual conduct to impeach witnesses."[46]

¶49 Here, the State called a forensic scientist to testify that the major DNA profile found in S.B.'s rape kit matched Mr. Beverly's DNA sample. On cross-examination, defense counsel inquired into the contributor of the minor profile that was also found in the kit. After a short redirect of its witness, the State took issue with defense counsel's focus on the minor DNA profile, and asked the trial court to preclude Mr. Beverly from using the scientist's testimony about the minor profile to suggest the possibility of a second sexual partner. The court then asked defense counsel how his proposed use of the minor profile evidence was relevant, to which he responded:

> [L]et us take, for example, her assertion that she was not cheating. . . . [T]he fact that there is the presence of male sperm from another individual found in her

---

[41] *State v. Tarrats*, 2005 UT 50, ¶ 22, 122 P.3d 581 (alteration in original) (citation omitted) (internal quotation marks omitted).

[42] *Id.* ¶ 20 (citation omitted) (internal quotation marks omitted).

[43] *Id.* ¶ 21 (quoting UTAH R. EVID. 412(a) advisory comm. note).

[44] UTAH R. EVID. 412(b)(1).

[45] *Id.* 412(b)(2).

[46] *State v. Boyd*, 2001 UT 30, ¶ 38 n.4, 25 P.3d 985.

vagina . . . would indicate that she made a false statement under oath, because she had lied about whether or not she was having the sexual relationship with someone else when, in fact . . . there's DNA from another male in her vagina. That would say that she has made false statements under oath. She lied about these[] circumstances, and she lied about the relationship when she was talking to my client. So, that would make it relevant.

The trial court held that this line of argument was barred under rules 412 and 403 of the Utah Rules of Evidence.

¶50 Mr. Beverly takes issue with this holding. He argues that "[b]oth the evidence and argument about the minor DNA profile suggesting another sexual partner were proper under rule 412," and so the trial court erred in precluding such evidence. Specifically, he contends that "evidence that the wife was cheating would contradict her testimony that she . . . had nothing to hide" and demonstrates S.B.'s motive to fabricate. But this is exactly the type of evidence rule 412 is meant to prohibit.

¶51 It is clear that rule 412 contains no exception for "the admission of past sexual conduct to impeach witnesses."[47] Allowing such argument would effectively destroy the purpose behind the rule—"to ensure that sexual assault victims are not 'deterred . . . from participating in prosecutions because of the fear of unwarranted inquiries into the victim's sexual behavior,'"[48] and to "safeguard[] the alleged victim from the invasion of privacy, potential embarrassment and sexual stereotyping that is associated with public disclosure of intimate sexual details and the infusion of sexual innuendo into the fact finding process."[49] Allowing Mr. Beverly to use the minor profile evidence to imply a second sexual partner, when the only value in doing so is to impeach the alleged victim, works to embarrass and stereotype S.B., and would deter future victims from participating in prosecutions of sexual misconduct. So we hold that the trial court did not err, under rule

---

[47] *Id.*¶

[48] *Tarrats*, 2005 UT 50, ¶ 20 (alteration in original) (quoting UTAH R. EVID. 412 advisory comm. note).

[49] UTAH R. EVID. 412(a) advisory comm. note.

412, in precluding him from using the minor profile evidence to show the possibility of a second sexual partner for impeachment purposes.

¶52 Mr. Beverly also asserts, however, that the minor DNA profile evidence is admissible to show "an alternate source [of the] injuries" S.B. sustained during the incident. At trial, the nurse who performed the sexual assault examination on S.B. testified that S.B. had bruises on her left elbow and thigh, an abrasion on her left nipple, a tear on her fourchette, and an abrasion on her perineum, and that these injuries were consistent with injuries of persons who have been raped. Mr. Beverly contends that he "should have been able to argue the possibility that those injuries were caused or aggravated by another source." He asserts that rule 412(b)(1) expressly permits this type of evidence at trial, and the court erred in keeping it out.[50]

¶53 Conversely, the State argues that rule 412(b)(1) applies only when "a defendant denies having sex with the victim," and the evidence is used to "show someone else is responsible for the physical evidence." In other words, the State argues that the exception in rule 412(b)(1) applies only when the "identity" of the alleged assaulter is at issue. And, because Mr. Beverly does not dispute that he engaged in sexual conduct with S.B. and that he was the source of the semen found, the State argues that the identity of the alleged assaulter is not at question, and so the trial court did not err when it held that the "other source" argument was inadmissible.[51]

---

[50] Rule 412(b)(1) allows a court to admit "evidence of specific instances of a victim's sexual behavior, if offered to prove that someone other than the defendant was the source of the semen, injury, or other physical evidence." UTAH R. EVID. 412(b)(1).

[51] The State also argues that the trial court correctly excluded Mr. Beverly's proposed use of the minor profile evidence because he "did not comply with [rule 412's] notice and hearing requirements." Specifically, it contends that, pursuant to rule 412(c)(1), Mr. Beverly was required to give notice of any evidence and argument regarding S.B.'s sexual history fourteen days prior to trial, and that he failed to do so here. But because we hold that the trial court correctly precluded his proposed use of the minor profile evidence under rule 403, we do not reach the merits of this argument.

¶54 While Mr. Beverly's contention in regard to the scope of rule 412(b)(1) may have merit,[52] this does not change the ultimate outcome here. Whether or not rule 412 precludes evidence of a second source of injury where it is undisputed that the defendant engaged in the alleged sexual acts, the trial court correctly excluded Mr. Beverly's argument under rule 403.

¶55 Rule 412 explicitly provides that before any evidence is admitted through one of its exceptions, it must also be "otherwise admissible" under the rules of evidence.[53] So a defendant attempting to admit evidence under rule 412(b)(1) must also meet the requirements of rule 403.[54] The trial court correctly held that Mr. Beverly failed to meet this test.

¶56 When reviewing a trial court's rule 403 determination, we allow courts "considerable freedom in applying [rule 403] to the facts."[55] "Trial courts have wide discretion in determining relevance, probative value, and prejudice."[56] This means that "we will not reverse the trial court's [403] ruling unless we find it was 'beyond

---

[52] In *State v. Boyd*, we held that, despite it being undisputed that the victim and the defendant had sexual intercourse, evidence of a second sexual partner "offered to demonstrate another potential source for [the victim's] physical condition following the rape . . . was admissible under rule 412(b)(1)." 2001 UT 30, ¶ 38. So Mr. Beverly is likely correct that rule 412(b)(1) does not preclude this evidence if offered as "source" evidence. But that does not mean "source" evidence should be automatically admitted. As we discuss below, our holding in *Boyd* also shows that "source" evidence may still be excluded under rule 403. *See id.* ¶ 39.

[53] *See* UTAH R. EVID. 412(b) ("The court may admit the following evidence if the evidence is otherwise admissible under these rules . . . .").

[54] *Boyd*, 2001 UT 30, ¶ 39 ("Evidence that fits the exception [to rule 412] 'may still be excluded if it does not satisfy requirements of the other evidence rules, including Rule 403.'" (citation omitted)).

[55] *Id.* ¶ 40 (alteration in original) (citation omitted).

[56] *State v. Kell*, 2002 UT 106, ¶ 32, 61 P.3d 1019.

the limits of [reasonableness].'"[57] Also, we presume a rape victim's past sexual conduct is inadmissible.[58]

¶57 In *State v. Boyd*, we considered an identical issue to the case at hand and determined that, even if "source" evidence is allowed under rule 412(b)(1), that evidence may still be kept out under rule 403.[59] In *Boyd*, the defendant was charged with raping the victim by pinning her down in a wooded area.[60] Because it was undisputed that the defendant had sex with the victim—the issue before the jury "was whether or not [the victim] consented."[61] At trial, a doctor testified that, upon physical examination of the victim, he found bruising and debris in the victim's vaginal area, which he claimed was consistent with the victim's allegation of rape.[62] The doctor also testified that the bruising and debris "could have been the result of consensual intercourse."[63] The defendant then sought to introduce evidence that the victim had engaged in sex with another person, in the same wooded area, prior to the alleged rape.[64] The defendant argued that the evidence was probative to the question of why there was debris and some bruising in the victim's vaginal area.[65] The trial court refused to admit the evidence under rule 403, however,

---

[57] *Boyd*, 2001 UT 30, ¶ 40 (second alteration in original) (citation omitted) (internal quotation marks omitted).

[58] *Id.* ¶ 41 ("When applying rule 403 to the admissibility of a rape victim's past sexual conduct, there is a presumption of inadmissibility.").

[59] *Id.* ¶¶ 41–43. Mr. Beverly failed to address this court's 403 determination in *Boyd*, despite the fact that it is directly on point and the State relied heavily on it in its briefing. Instead, Mr. Beverly focuses only on the *Boyd* court's holding that the second source evidence in that case was not precluded under rule 412. But, as noted above, evidence that may be admitted under rule 412(b)(1) must also be "otherwise admissible" under rule 403.

[60] *Id.* ¶ 4.

[61] *Id.* ¶ 42.

[62] *Id.* ¶ 43.

[63] *Id.*

[64] *Id.* ¶¶ 8, 33.

[65] *Id.* ¶¶ 42–43.

holding that the "probative value of the evidence did not outweigh its inherent prejudicial value."[66]

¶58 This court affirmed on appeal.[67] We reasoned that because the doctor testified that the physical evidence was indicative of both rape and consensual sex, "demonstrating an alternate source for some of the [evidence] was not highly probative to the question that was before the jury, i.e., whether the intercourse was consensual."[68] And, because the defendant's evidence was "inherent[ly] prejudicial," we held the district court did not abuse its discretion.[69]

¶59 Here, Mr. Beverly seeks to admit evidence identical to the evidence the defendant sought to admit in *Boyd*. He seeks to admit other "source" evidence under rule 412(b)(1) to refute the nurse's statements that S.B.'s injuries were consistent with her description of the alleged rape. But, like the defendant in *Boyd*, Mr. Beverly does not contest that he had sexual intercourse with S.B., and so the only issue before the jury was whether S.B. consented. And, like the doctor in *Boyd*, the nurse here also testified that these injuries were consistent with those caused by consensual sex. Thus, it is safe to say that, like *Boyd*, Mr. Beverly's use of minor profile evidence was properly excluded because it is only slightly probative of the issue of consent, but is highly prejudicial.

¶60 Furthermore, the evidence Mr. Beverly seeks to admit in this case is even less probative than that in *Boyd*, given the fact that the forensic scientist could not determine whether the minor profile was from another male or simply S.B.'s cells left over from the scraping process. The district court noted this in its decision:

> I think the 403 analysis here kicks in [to prohibit Mr. Beverly's argument] because the probative value of this evidence that is brought is, number one, the other strain of the cells that were found there were not determined to be male or female, and very well, because of the scraping process, it sounds to me more likely than not, and that's not the expert's words, that's my assumption, that those cells were probably vaginal

---

[66] *Id.* ¶ 43.

[67] *Id.*

[68] *Id.*

[69] *Id.*

cells that came from scraping the vagina to try to include the semen.

Because it is unknown whether the minor DNA profile matches that of another male, or is simply S.B.'s own cells, Mr. Beverly is asking the jury to speculate as to possible sexual conduct that he cannot even show occurred by the preponderance of the evidence. So Mr. Beverly's "source" evidence and argument has little value.

¶61 Because the probative value of the minor profile evidence is slight and the prejudicial value is high, the trial court correctly precluded Mr. Beverly's proposed use of the minor profile evidence. Accordingly, we affirm the trial court's ruling on this point.

### III. Rule 404(b) and Mr. Beverly's Prior Bad Acts

¶62 Mr. Beverly also argues that the district court erred in admitting testimony concerning instances where he had choked S.B. and threatened her life, and in prohibiting him from inquiring into the details of a 1993 New Year's Eve incident on cross-examination. We disagree. The trial court did not err in admitting Mr. Beverly's prior bad acts, because they were brought for a plausible, non-propensity reason, and these acts were highly probative of the central issue in the case—S.B.'s mental state during the alleged rape. Similarly, the court did not err in limiting defense counsel's cross-examination, because the 1993 New Year's Eve incident did not involve instances of violence or death threats—the subject matter of S.B.'s testimony—and defense counsel was permitted to contextualize both the November 1993 choking incident and the December 2004 choking incident.

*A. The Trial Court Did Not Abuse Its Discretion in Admitting "Bad Acts" Evidence*

¶63 Under Utah law, "[e]vidence of prior bad acts must clear several evidentiary hurdles before admission—rules 404(b), 402, and 403."[70]

¶64 Under rule 404(b), evidence of a prior bad act "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character."[71] But "evidence may be admissible for another purpose,"

---

[70] *State v. Lucero*, 2014 UT 15, ¶ 13, 328 P.3d 841, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016.

[71] UTAH R. EVID. 404(b)(1).

including to show a person's mental state during the commission of a crime.[72] So in order to clear the rule 404(b) hurdle, we must decide "whether the evidence has a plausible, avowed purpose beyond the propensity purpose that the rule deems improper."[73] When a court finds a "plausible, avowed" non-propensity purpose, "the evidence is [deemed] presumptively admissible (subject to rule 402 and 403 analysis)."[74]

¶65 At a preliminary hearing, S.B. testified that Mr. Beverly had a history of domestic violence. She testified that on two occasions, in November 1993 and December 2004, he had choked her. She also testified that during the course of their marriage, Mr. Beverly had verbally threatened her life on multiple occasions. Defense counsel objected to this testimony at the hearing, claiming that it was impermissible character evidence. On direct examination at trial, S.B. then testified that "there's been some times where he's physically harmed me, he's choked me or threatened to kill me." She did not mention any details about specific instances.

¶66 Mr. Beverly argues that the trial court erred in admitting evidence of his prior bad acts because it was admitted as character evidence. But the State argues, and the trial court agreed below, that this evidence was admitted to show S.B.'s mental state of during the alleged rape. Specifically, the trial court admitted this evidence because his "domestic violence history towards the alleged victim goes to whether the alleged victim . . . was overcome by fear for her safety" and "explain[s] to the jury the mental state of the alleged victim at the time of the sexual act." The State argues that this was a "plausible" purpose beyond propensity and so should be admitted. We agree.

¶67 The trial court's conclusion—that the domestic violence evidence was for a "plausible, avowed purpose beyond propensity"—was not error for two reasons. First, there were ample grounds for the court's determination. Testimony at trial showed that S.B. did not *physically* resist Mr. Beverly's sexual advances. S.B. testified that after verbally refusing, she eventually did what

---

[72] *Id.* 404(b)(2).

[73] *State v. Thornton*, 2017 UT 9, ¶ 58, 391 P.3d 1016 (emphasis omitted).

[74] *Id.*

Mr. Beverly asked her to do: she took her clothes off, touched him, and did not physically resist sexual intercourse. The question for the jury, therefore, was whether the sexual encounter was consensual—in other words, what was S.B. thinking during the incident? At trial, the State sought to admit Mr. Beverly's history of domestic violence, claiming that his history was necessary to explain why S.B. did not physically resist. Because S.B.'s mental state was the central issue in the case, it is not only plausible that the State intended the domestic violence evidence to be admitted to show S.B.'s state of mind, it is highly likely this was its main purpose.

¶68 Second, the fact that the jury could use the domestic violence evidence for an improper character purpose does not preclude the evidence under rule 404(b). Mr. Beverly admits that establishing S.B.'s state of mind during the incident is a proper purpose, and even that it may have been one of the State's purposes in admitting the evidence. But he argues that the State was not required to show why S.B. did not physically resist under the law, and so it is "more likely that the prosecution wished to introduce this evidence to create 'an alternative, illegitimate narrative.'" We have stated, however, that the fact that "the prior misconduct evidence [can possibly] sustain an improper inference . . . is not enough to dictate the exclusion of this evidence under rule 404(b)."[75] When we can say that the evidence has a claimed non-propensity purpose that is plausible, the presumption is that a court should admit it.[76] So the trial court did not err in its decision under rule 404(b).

¶69  But that is not the end of the evaluation.[77] "[E]ven if the past misconduct evidence in this case could plausibly be deemed to have

---

[75] *Id.*

[76] *Id.* ("The threshold 404(b) question is whether the evidence has a plausible, avowed purpose beyond the propensity purpose that the rule deems improper. If it does then the evidence is presumptively admissible (subject to rule 402 and 403 analysis)."(emphasis omitted)).

[77] The next step would be to evaluate the "bad acts" evidence for relevance under rule 402. But Mr. Beverly did not argue the bad acts evidence was precluded under this rule—likely because the evidence is clearly relevant. Evidence is considered relevant if "it has *any tendency* to make a fact more or less probable than it would be

(Continued)

been aimed at a legitimate purpose under rule 404(b), it [may] still fail under the balancing framework required by rule 403."[78] Under rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[79] Trial courts are given considerable discretion when making this determination.[80]

¶70 Here, the trial court held that the domestic violence evidence did not violate rule 403 of the Utah Rules of Evidence. In its minute entry on the matter, the court explicitly stated that "[t]he probative value of the proposed evidence is sizable" and that the question of "[w]hether a person consents to a sexual act is very difficult to prove because it is impossible to determine the thoughts of another person." It then found the domestic violence evidence the only "source that would explain the alleged victim's mental state." The court admitted that "the jury may think less of [Mr. Beverly] because of the 'bad acts' evidence," but it concluded that "whatever damage [to Mr. Beverly] . . . is slight, when weighed against the probative value of the evidence."

¶71 Mr. Beverly argues that the trial court's 403 determination was wrong, and he asserts that the domestic violence evidence had little probative value. Specifically, he claims that the trial court should have precluded this evidence because evidence of S.B.'s mental state was not crucial to the prosecution and has little probative value when compared to the inherent prejudice that comes from the jury hearing about his prior acts of domestic violence. We disagree with his arguments.

¶72 The trial court did not err in admitting Mr. Beverly's prior bad acts, because the probative value of this evidence was

---

without the evidence." UTAH R. EVID. 401(a) (emphasis added). The domestic violence evidence is obviously relevant to this case—it makes it more probable that S.B. was scared of Mr. Beverly and so chose not to physically resist his advances. So we proceed to the next hurdle—rule 403.

[78] *State v. Verde*, 2012 UT 60, ¶ 31, 296 P.3d 673, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016.

[79] UTAH R. EVID. 403.

[80] *State v. Kell*, 2002 UT 106, ¶ 32, 61 P.3d 1019.

overwhelming. At trial, Mr. Beverly attempted to show that he had gotten S.B. "in the mood" and that she eventually consented. For support, he highlighted the fact that S.B. did not physically resist his advances and that she touched him and told him she loved him. Evidence that he had previously choked her and threatened to kill her was therefore both crucial and highly probative to refute Mr. Beverly's defense and to provide a reason, outside of consent, for S.B.'s actions and statements. In fact, his prior acts of domestic violence were, as the trial court noted, the State's only evidence that would explain S.B.'s alleged mental state during the incident. So its probative value was substantial. While this evidence was prejudicial, in that it reflected negatively on Mr. Beverly, given its overwhelming probative value we cannot say that "its probative value is substantially outweighed by a danger of . . . unfair prejudice."[81] Accordingly, we hold that the trial court did not err in admitting the 404(b) evidence.

### B. The Trial Court Did Not Err in Limiting Defense Counsel's Cross-Examination

¶73 Mr. Beverly also argues that the trial court erred when it precluded him on cross-examination from questioning S.B. about the details of specific instances of abuse. Specifically, he argues that the court erred by not allowing him to contextualize the choking incidents or to inquire into the 1993 New Year's Eve incident. But his argument is flawed. The trial court did not err here because Mr. Beverly was allowed to contextualize the two choking incidents at trial. Similarly, the trial court did not abuse its discretion in limiting defense counsel's cross-examination of the 1993 New Year's Eve incident, because that incident did not involve domestic violence or death threats and so had little probative value.

¶74 As noted above, S.B. testified at a preliminary hearing that she was choked by Mr. Beverly on two occasions—once in November 1993, the other in December 2004—and that he had verbally threatened her life in the past. At trial, S.B. did not speak about these specific instances on direct-examination. Instead, she stated only that "there's been some times where he's physically harmed me, he's choked me or threatened to kill me." On cross, defense counsel questioned S.B. about the specific details of those choking incidents. Defense counsel first asked S.B. about the

---

[81] UTAH R. EVID. 403.

November 1993 incident. She replied that she did not remember much about the circumstances of the incident, but did remember being choked. Defense counsel did not inquire further into the November 1993 incident, nor was his questioning limited by the trial court with respect to this incident. Defense counsel then attempted to ask about the 1993 New Year's Eve incident, and the State objected on grounds that this line of questioning violated rule 403. The trial court prohibited defense counsel from inquiring into the 1993 New Year's Eve incident because it was "too old" and was "no longer relevant." But the court allowed defense counsel to question S.B. about the December 2004 incident, stating that counsel "can go into it as much as he chooses." Defense counsel then questioned S.B. about the details of the December 2004 choking incident.

¶75 Mr. Beverly first argues that the trial court erred because he was unable to inquire into choking incidents and so was unable to contextualize them for the jury. But, as noted above, counsel did question S.B. about both the November 1993 and the December 2004 choking incidents. In fact, the court expressly stated that defense counsel could inquire into the December 2004 choking incident as much as he desired and did not limit questioning on the November 1993 incident. So defense counsel was clearly able to contextualize these instances, and his argument is without merit.

¶76 Despite having sufficient opportunity to inquire into these incidents, Mr. Beverly also takes issue with the fact that he was unable to inquire into details about "one incident of alleged abuse"—the 1993 New Year's Eve incident.[82] He claims that he should have been able to show how old the choking incidents were and that some arguments resulted in both parties getting in trouble with the police. But his assertion that the 1993 New Year's Eve incident involved violence or choking is a misrepresentation. S.B. made no mention of choking or violence when describing this incident at the preliminary hearing. Despite extensive questioning by defense counsel about the 1993 New Year's Eve incident, S.B. testified only that she and Mr. Beverly were in an argument that day and were both cited for disorderly conduct. In fact, on direct examination in that hearing, the State specifically asked her if any physical violence occurred on the 1993 New Year's Eve incident, and S.B. said "No." So inquiring about the 1993 New Year's Eve incident

---

[82] His counsel described this incident as a "third choking incident" before the district court below.

would not date the choking incidents, as no choking took place during this incident, or show that both parties were cited during violent disputes, as no violence took place during this incident. The trial court therefore did not err in limiting defense counsel's cross-examination on this point.

¶77 Additionally, to the extent that Mr. Beverly argues that he should have been allowed to inquire into the 1993 New Year's Eve incident, despite the fact that no violence occurred on that day, his argument fails. "Trial courts have 'broad discretion in restricting the scope of cross-examination'"[83] and in making rule 403 determinations.[84] Here, the trial court concluded that this incident was "so long ago, and it's so remote, that I—I don't believe it's relevant at this point to get into the absolute details." The court's holding is reasonable. The 1993 New Year's Eve incident did not involve violence or choking but was merely a verbal fight. And it happened more than twenty years before the alleged rape. Given the age and context of the incident, its probative value seems slight. But the risk of confusing the jury seems high—as counsel was trying to add yet another trial within a trial. So the trial court did not abuse its discretion in precluding inquiry into this incident.

¶78 Accordingly, the trial court did not err in admitting Mr. Beverly's prior acts of domestic violence and did not err in limiting defense counsel's inquiry on cross-examination.

### IV. Cumulative Error

¶79 Finally, Mr. Beverly argues that the cumulative effect of these alleged errors "requires reversal." But because Mr. Beverly has failed to demonstrate the existence of more than a single potential error, his argument fails.

¶80 Under the doctrine of cumulative error, we will reverse "if 'the cumulative effect of the *several errors* undermines our confidence . . . that a fair trial was had.'"[85] This means that "the

---

[83] *State v. Tarrats*, 2005 UT 50, ¶ 16, 122 P.3d 581 (citation omitted).

[84] *Kell*, 2002 UT 106, ¶ 32.

[85] *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993) (alteration in original) (emphasis added) (citation omitted).

cumulative-error doctrine has no application when only a single error has been determined or assumed on appeal."[86]

¶81 Here, Mr. Beverly could potentially prove only that a single error occurred in his trial below—his counsel's failure in objecting to the trial judge's comments.[87] He has not shown that the trial court abused its discretion in precluding his use of the minor DNA profile evidence, in admitting evidence of his prior bad acts under rule 404(b), or in limiting defense counsel's cross-examination on these prior bad acts. Because he could potentially prove only a single error on appeal, the cumulative error doctrine cannot apply, and so Mr. Beverly's cumulative error argument fails.

**Conclusion**

¶82 Mr. Beverly asserts that the trial judge violated his constitutional rights when the judge made comments to the jury pool about the O.J. Simpson case. But we decline to review this argument because Mr. Beverly failed to preserve these claims below and failed to meet an exception to preservation on appeal.

¶83 Additionally, we affirm the trial court's evidentiary rulings. The trial court did not err in concluding that the alleged second sexual partner evidence created a danger of unfair prejudice that substantially outweighed the evidence's probative value. The trial court also did not error in admitting the evidence of Mr. Beverly's prior bad acts or limiting defense counsel's cross-examination of S.B. on that point. Finally, we hold that the cumulative error doctrine does not apply to this case because Mr. Beverly has identified only a single potential error below—that his trial counsel failed to object to the trial judge's comments to the jury. Accordingly, we affirm Mr. Beverly's convictions.

––––––––––

[86] *Conocophillips Co. v. Utah Dep't of Transp.*, 2017 UT App 68, ¶ 32, 397 P.3d 772.

[87] Because this alleged failure did not result in *Strickland* level prejudice, we did not need to decide whether it constituted an error as part of Mr. Beverly's ineffective assistance of counsel claim. We again decline to decide whether this alleged failure constituted an error as part of our cumulative error analysis because, even if we assume that it was an error, a single error is insufficient to sustain a cumulative error claim.